Enrique SEGNI, Plaintiff–Appellee,

v.

COMMERCIAL OFFICE OF SPAIN, Defendant–Appellant.

No. 87–1154.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1987.

Decided Dec. 8, 1987.

Franklin P. Auwarter, Mayer, Brown & Platt, Chicago, Ill., for defendant-appellant.

Richard J. Witry, McCarthy, Duffy, Neidhart & Snakard, Chicago, Ill., for plaintiff-appellee.

Before WOOD, FLAUM and EASTERBROOK, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

In August of 1984 the Commercial Office of Spain hired Enrique Segni to develop a market for Spanish wines in the midwestern United States. In March of 1985 Segni was fired, whereupon he filed this lawsuit in the district court. The Commercial Office moved for dismissal, claiming immunity from suit under the terms of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ("FSIA"). The district court denied the motion, and the Commercial Office appeals. We affirm for the reasons expressed herein.

## I.

We accept the allegations in Segni's complaint as true for purposes of this appeal. Those allegations indicate that Segni is a citizen of Argentina and a lawful permanent resident of the United States. He was hired by the Commercial Office on August 1, 1984 pursuant to a written "Contract of Labor." The Commercial Office is an arm of the National Institute for Fostering Exports ("INFE") and is charged under Spanish law with the directing and coordinating

of INFE's activities in the United States. The contract was to run for three years and provided that Segni would be engaged in "developing the marketing of Spanish wines in the midwest area of the United States." The contract further provided that Segni would receive a set monthly salary subject to increase upon annual review and that he would be reimbursed for expenses. Under the contract Segni was entitled to choose between Spanish and United States Social Security. He was given 30 days vacation each year and all Spanish and American holidays off, and was required to own an automobile suitable for his business, for which he was to receive mileage reimbursement.

The Commercial Office terminated Segni's employment on March 31, 1985. Segni filed suit in federal district court, charging that the Commercial Office had breached the contract and seeking payment for the remainder of the contract term as damages. Initial service of the complaint in the Commercial Office itself was quashed by the district court,[1] but proper service was later effected on the Spanish Ministry of Justice in Madrid.

The Commercial Office moved to dismiss the complaint. It argued that Segni had been hired to execute the policy of the Spanish government, *i.e.* the fostering of exports of Spanish wines to the American midwest, and that his employment by the Commercial Office was a public act for which the Office, as an arm of the Spanish government, was entitled to sovereign immunity under the FSIA, 28 U.S.C. § 1604. The district court disagreed, finding Segni's hiring to be commercial in nature and therefore subject to the "commercial activity" exception to the FSIA, 28 U.S.C. § 1605(a)(2). The motion to dismiss was accordingly denied. *Segni v. Commercial*

*Office of Spain,* 650 F.Supp. 1042 (N.D.Ill. 1986). This appeal followed.[2]

## II.

The concept of sovereign immunity embraces two forms: absolute and restrictive. The former of these was the governing principle of this nation for most of the first 175 years of its history. Absolute sovereign immunity shields all acts in which a foreign sovereign is formally involved from judicial scrutiny, and is based on the principle that each domestic sovereign waives its judicial power over foreign sovereigns in the interest of compelling intercourse among them, recognizing the "perfect equality and absolute independence of sovereigns." *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812). This rule remained in force until 1952, when the Department of State renounced the absolute position in favor of the second, "restrictive" form, which shields the public acts of foreign sovereigns but does not protect them from liability for such private acts as they may undertake.[3] The extension of immunity was thereafter resolved by the Department of State on a case-by-case basis until 1976, when Congress enacted the FSIA, thereby placing into the hands of the federal courts the task of determining the extent to which particular actions of foreign nations are immune from their power.

The FSIA provides immunity to foreign states as a general matter, but subject to enumerated exceptions. The general principle of immunity is stated at 28 U.S.C. § 1604:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as

---

1. *Segni v. Commercial Office of Spain,* 650 F.Supp. 1040 (N.D.Ill.1986).

2. A panel of this court has held that the order denying the Commercial Office's motion to dismiss, although interlocutory, was immediately appealable. *Segni v. Commercial Office of Spain,* 816 F.2d 344 (7th Cir.1987).

3. The change in policy was announced in a letter from the State Department's Legal Advisor to the Attorney General. The text of the "Tate letter" is reproduced as an appendix to the Supreme Court's opinion in *Alfred Dunhill of London v. Republic of Cuba,* 425 U.S. 682, 711–15, 96 S.Ct. 1854, 1869–71, 48 L.Ed.2d 301 (1976).

provided in sections 1605 to 1607 of this chapter.

Exceptions are listed at § 1605. The exception most frequently invoked, and the one that Segni argues is applicable to his hiring, is the "commercial activity" exception set forth at 28 U.S.C. § 1605(a)(2), which provides, in relevant part, that:

A foreign state shall not be immune from the jurisdiction of courts of the United States in any case— ... in which the action is based upon a commercial activity carried on in the United States by the foreign state ....

Obviously the critical function of the courts in administering this exception to the FSIA is the interpretation of the phrase "commercial activity". The definition provided in the text of the Act is not by itself very helpful:

For purposes of this chapter—

A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). As the Fifth Circuit has noted, this definition is "somewhat circular," defining "commercial activity" in terms of "commercial conduct" and "commercial transaction." *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1108 n. 6 (5th Cir.1985). Nevertheless the definition does direct our attention to the nature, rather than the purpose, of the act under scrutiny. As we will see below, this distinction will guide us to our ultimate resolution.

Although the statutory definition of "commercial activity" is broad, the legislative history provides some useful guidance. In fact, the corresponding House Report specifically indicates that Congress intended to afford the federal courts "a great deal of latitude in determining what is a 'commercial activity'" under the FSIA. H.Rep. No. 94–1487, 94th Cong., 2d Sess. at 16, *reprinted at* 1976 U.S. Code Cong. & Ad. News 6604, 6615. The Report emphasizes that an underlying public purpose will not provide a foreign state with protection for an act which is private by nature:

As the definition indicates, the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity. The same would be true of a contract to make repairs on an embassy building. Such contracts should be considered to be commercial contracts, even if their ultimate object is to further a public function.

*Id.* Contracts for the purchase of goods or services are mentioned several times in the report as activities that ought normally to be considered commercial.

Despite Congress' clear pronouncement of the nature/purpose distinction, application to a given activity is not as simple as it may seem, primarily because the terms "nature" and "purpose" are not totally discrete. The Fifth Circuit has commented on the difficulty in separating these concepts:

We do not interpret this provision, however, to bar us totally from considering the purposes of different types of activities. Indeed, we do not believe that an absolute separation is always possible between the ontology and the teleology of an act. Often, the essence of an act is defined by its purpose—gift-giving, for example. Unless we can inquire into the purposes of such acts, we cannot determine their nature. Indeed, commercial acts themselves are defined largely by reference to their purpose. What makes these acts commercial is not some ethereal essence inhering in conduct itself; instead, as Congress recognized, acts are commercial because they are generally engaged in for profit.

*De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1393 (5th Cir.1985).

The difficulty of the nature/purpose distinction has resulted in differing approaches on the parts of different courts.

In *De Sanchez*, for example, the court considered a national bank's sale of U.S. dollars and found it to be governmental in nature. The purpose of the sale, regulation of national currency reserves, was deemed to "define[ ] the conduct's nature" rather than serving as an ancillary factor. 770 F.2d at 1393–94. This result may be compared with that in *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543 (D.C.Cir.1987), in which a contract for consulting services was found to be commercial. The contract called for the plaintiff to create and implement "a comprehensive program for development of Bolivia's rural areas," 811 F.2d at 1545, but that much of its purpose did not figure in the court's analysis, which simply rejected the notion that certain subsidiary contract terms defined the nature of the agreement. The court concluded that the contract at bottom was one for services and was therefore commercial.

These two cases illustrate the problems involved in determining where nature ends and purpose begins. Both courts purported to subscribe to the rule that the nature of a transaction for FSIA purposes may be divined by asking whether a similar agreement could have been entered into with a private party. *See Practical Concepts*, 811 F.2d at 1549, *citing Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 309 (2d Cir.1981) ("If the activity is one in which a private person could engage, it is not entitled to immunity."), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *De Sanchez*, 770 F.2d at 1394 ("Where a state enters into a contract that is sovereign in nature, however, the balancing of interests is different. The private party could not have entered into a similar contract with other private parties and has no legitimate expectation of being able to bring suit on the contract."). The *Practical Concepts* court considered its contract to be one simply for services, without regard to the likelihood that any nongovernmental entity would

ever undertake rural development efforts. Conversely the sale of dollars in *De Sanchez*, an activity frequently engaged in by private parties, was found to be governmental.

In the case now before us, the nature/purpose distinction is further muddied by the fact that the public purpose behind Segni's hiring, as cited by the Commercial Office (and not disputed by Segni) is itself related to commerce. The Commercial Office asserts that Segni was hired to carry out a specific and articulated policy of the Spanish government, *i.e.* the promotion of foreign sales of Spanish wine, a significant component of that country's export business. Obviously the government wishes to promote these sales in order to increase the health of the Spanish economy. Thus, confusingly enough, we must decide whether the *nature* of Segni's hiring is commercial, conscious of the fact that the underlying *purpose* is both commercial *and* public. In doing so we are sympathetic to the concerns expressed by the *De Sanchez* court, *see supra* p. 163, about the difficulty in separating these concepts. Nevertheless, the command of Congress embodied in 28 U.S.C. § 1603(d) requires that we confine any consideration of purpose as closely as we can, considering that purpose only so far as is absolutely necessary to define the nature of the act in question.

At its simplest level this case concerns a contract for the purchase of services. The Commercial Office argues that this characterization is too narrow, but its own characterization is far too broad. The Office describes Segni's work as "diplomatic activity," the direct execution of a policy designed to increase Spanish exports and thereby reduce unemployment in Spain. Even if, as we may assume, this is a correct summary of the concerns that prompted Segni's hiring, this characterization of his duties completely defines Segni's job in terms of the purpose behind it, and therefore contravenes Congress' direction that we avoid that inquiry.[4] In reality, any

4. The only case cited by the Commercial Office that supports this sort of characterization is *Gittler v. German Information Center*, 95

Misc.2d 788, 408 N.Y.S.2d 600 (S.Ct.1978), in which a contract between a German government agency and an independent filmmaker

governmental action, including the paradigmatically commercial purchase of goods, can be defined as the execution of some governmental policy or purpose.

It is nevertheless too simple on the other hand to define Segni's contract as merely the purchase of services. That much is made clear by *Broadbent v. Organization of American States*, 628 F.2d 27 (D.C.Cir. 1980). In that case a group of terminated staff members sued their former employer, an international organization entitled to the protection of the FSIA. The court found that the relationship between the organization and its "internal administrative staff" was not commercial, and in doing so found the plaintiffs to be in the position of civil servants employed by a sovereign. That type of employee is specifically mentioned in the legislative history of the FSIA as being outside the "commercial activity" exception. H.Rep. 94–1487, *supra* p. 16, 1976 U.S.C.C. & A.N. at 6615.[5]

 *Broadbent* demonstrates that the mere fact that Segni was an employee of the Commercial Office will not, by itself, render his hiring commercial activity. Our characterization of the relationship between these parties cannot simply append a name to that relationship. We must also examine the nature of Segni's "employment activities" in order to determine whether *they* are governmental or private.[6] An examination of the nature of his activities indicates that he cannot be considered

either as a civil servant or a diplomatic officer. He had no role in the creation of the government policy or its administration; rather, he simply carried it out. There is no indication in the record that he was so supervised or monitored by the Commercial Office, or so privy to its political deliberations, as to be considered a part of the Spanish government, as a civil servant or diplomat would be. In that regard it is of little consequence that Segni was permitted to elect to contribute to Spanish Social Security. Such a subsidiary term cannot render an otherwise essentially commercial contract a governmental one for FSIA purposes. *See Practical Concepts*, 811 F.2d at 1549–50.[7]

For purposes of this case, Segni's employment by the Commercial Office is best described as a contract under which he would provide services in the area of product marketing. This characterization reveals the nature of his activity without relying on its underlying government purpose. The hiring of a marketing agent is certainly an "activity ... in which a private person could engage," *Texas Trading*, 647 F.2d 300, and many do, including individual businesses as well as associations of like business entities. Accordingly, we conclude that the district court correctly determined that the Commercial Office is not entitled to immunity from Segni's breach-of-contract claim. We are supported in our conclusion by the very text of the House report on the FSIA:

was found to be governmental for purposes of the FSIA. The contract called for the filmmaker to produce films that would foster cultural relations between West Germany and the United States. While the purpose of that contract was clearly public, we believe that its nature was commercial, and we therefore decline to follow that case, which is one of the few state court cases applying the FSIA. *See also* Comment, *The Foreign Sovereign Immunities Act: Defining Commercial Activity and Direct Effects Jurisdiction*, 25 Santa Clara L. Rev. 105, 110 (1985) (describing the result in *Gittler* as "grossly erroneous").

5. "Also public or governmental, and not commercial in nature, would be the employment of diplomatic, civil service, or military personnel, but not the employment of American citizens or third country nationals by the foreign state in the United States."

6. Comment, *supra* n. 4, at 111–12; *cf. MacArthur Area Citizen's Ass'n v. Republic of Peru*, 809 F.2d 918, 920 (D.C.Cir.1987) (operation of diplomatic chancery in neighborhood building cannot be characterized simply as operation of an office).

7. It is also worth noting that Segni is not a citizen of Spain. The legislative history of the FSIA suggests that an employee's status as a "third country national," *supra* n. 5, is relevant to the commercial nature of his employment. We need not determine how important this factor is, though; it is sufficient to observe that a person hired by his own country's government to work abroad should have a somewhat lesser expectation of suing his homeland in his host nation's courts.

It has seemed unwise to attempt an excessively precise definition of [commercial activity], even if that were practicable. Activities such as a foreign government's sale of a service or a product, its leasing of property, its borrowing of money, its employment or engagement of laborers, clerical staff *or public relations or marketing agents*, or its investment in a security of an American corporation, would be among those included within the definition.

H.Rep. 94–1487, *supra* p. 16, 1976 U.S.C.C. & A.N. 6615 (emphasis added).

The order of the district court is AF-FIRMED.