**RUSH–PRESBYTERIAN–ST. LUKE'S MEDICAL CENTER, et al., Plaintiffs,**

v.

**The HELLENIC REPUBLIC, a foreign country, et al., Defendants.**

**No. 86 C 2021.**

United States District Court, N.D. Illinois, E.D.

July 11, 1988.

Catalina J. Sugayan, Floyd A. Wisner, William C. Anderson, Lord Bissell & Brook, Chicago, Ill., for Rush–Presbyterian–St. Luke's Medical Center.

Peter Petrakis, Andrew T. Berlin, Katten Muchin Zavis Pearl Greenberger & Galler, Chicago, Ill., for South Chicago Community Hosp.

Theodore Rodes, Jr., Porikos & Rodes, Martha A. Mills, Foss Schuman Drake & Barnard, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Rush–Presbyterian–St. Luke's Medical Center (Rush) and South Chicago Community Hospital (South Chicago) brought suit seeking the payment of medical bills for kidney transplants provided in their facilities to Greek nationals by Chicago Regional Organ and Tissue Bank (CROTB). CROTB and two staff members were joined as involuntary plaintiffs.

Defendants move to quash summons and dismiss the case on the ground that they are immune from suit under the Foreign Sovereign Immunities Act (FSIA), 28 U.S. C. §§ 1330, 1602–1611. Rush and South Chicago assert that because defendants, in contracting for the transplants, engaged in commercial activity carried on in and having a direct effect on the United States, they are amenable to suit under the FSIA. We agree and deny the motion.

### FACTS[1]

In December 1983 CROTB, through its president, Dr. Merkel, and June Bator, its director of development, contracted with defendants to perform operations on Greek nationals in Chicago under an "International Kidney Transplant Programme" (Rush cplt. exh. A). The contract included estimated costs of the transplant procedures (Rush cplt. exh. A). Defendants agreed to "assume responsibility of all the expenses of" surgery for certain patients once CROTB sent them the relevant itemized bills (Rush cplt. exh. B). CROTB subsequently entered into agreements with Rush and South Chicago, whereby the hospitals would admit Greek transplant patients and CROTB would obtain from defendants and disburse to plaintiffs payment for the medical services (Rush cplt. ¶ 7). The parties do not dispute that the contract was negotiat-

ed in Greece and executed and performed in the United States. They further agree that the paper work for the transplants, including bills, statements and payments, was "funneled through" the Greek consulate in Chicago. Finally, it is not contested that defendants made payments to plaintiffs for the transplants through the American National Bank in Chicago.

CROTB performed transplants on those Greek nationals who had obtained defendants' approval at Rush and South Chicago in 1983 and 1984. CROTB submitted bills to defendants for plaintiffs' treatment of the patients (Rush cplt. exh. C). Defendants, claiming that the costs estimated by CROTB in its agreement were binding and that CROTB had not adequately documented the bills, made partial payments for the services rendered but refused to pay the full amounts plaintiffs claimed were due. Rush claims defendants owe it $346,915.81 under the contract (cplt. ¶ 10); South Chicago asserts that it is owed approximately $203,219.48 (South Chicago resp. at 3); and CROTB seeks a balance of $5,995 (cplt. ¶ 9). All three complaints include a count in *quantum meruit* for the benefits conferred upon defendants.

Defendants now maintain that this court lacks jurisdiction to entertain this suit under the FSIA since in contracting with CROTB they were performing a governmental function. In an unsigned affidavit defendants assert that the Greek government provides health care for its citizens (Mousouri aff. exh. D at 2–3). They further assert that the medical benefit system in Greece is funded by the State in accordance with State guidelines and specific payments sought for services rendered must meet the approval of the Greek government (Mousouri aff. at 5). From the Greek government's regulation of health care, defendants conclude that they acted as a sovereign, and not in a commercial capacity,

1. Though defendants do not so specify in their motion, we conclude that they move to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure (lack of subject matter jurisdiction). To determine whether a 12(b)(1) dismis-

sal is appropriate, we are not confined by the pleadings but review all evidence submitted by both parties on the issue of jurisdiction. *See Western Transportation Co. v. Couzens Warehouse,* 695 F.2d 1033, 1038 (7th Cir.1982).

when they contracted with CROTB to provide the transplants for Greek citizens.[2]

## DISCUSSION

### I. Subject Matter Jurisdiction

Before 1952 this nation traditionally granted foreign countries complete immunity from suit in American courts. *See The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812) (recognizing the "perfect equality and absolute independence of sovereigns"). The State Department announced the replacement of this absolute theory of sovereign immunity with the restrictive theory in 1952. *Tate Letter*, 26 Dept. of State Bull. 984 (1952) *reprinted in Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 711–15 app., 96 S.Ct. 1854, 1869–71 app., 48 L.Ed.2d 301 (1976). Under the restrictive theory public acts of foreign sovereigns are shielded from judicial scrutiny, but private acts receive no similar protection. *Segni v. Commercial Office of Spain*, 835 F.2d 160, 162 (7th Cir.1987). The application of the new doctrine was left generally within the discretion of the State Department until Congress enacted the FSIA in 1976. *See generally Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486–89, 103 S.Ct. 1962, 1967–69, 76 L.Ed.2d 81 (1983).

The FSIA essentially codifies the restrictive theory of sovereign immunity, *id.* at 488, 103 S.Ct. at 1968, and gives the federal judiciary the responsibility of determining the extent to which particular actions of foreign states are immune from its power. The FSIA provides that, with certain enumerated exceptions, foreign states shall be immune from suit in federal and state courts. 28 U.S.C. § 1604.[3] If one of the exceptions to the general grant of sovereign immunity applies, the FSIA confers subject matter jurisdiction on the district courts. 28 U.S.C. § 1330(a).

### A. Commercial Activity

The exception at issue here, and the one that courts are most frequently asked to consider, is the "commercial activity" exception appearing at § 1605(a)(2), which provides in relevant part that

(a) A foreign state shall not be immune from jurisdiction of the courts of the United States or of the States in any case—

\*     \*     \*     \*     \*     \*

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign states; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

The requirement set forth in the three clauses of § 1605(a)(2) ensure that a sufficient connection exists between the commercial activity in question and the United States. *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1549 n. 12 (D.C.Cir.1987); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1110 (5th Cir.1985).

To determine whether defendants are immune from suit under the FSIA we must answer the critical question: is the activity upon which the action is based properly described as "commercial" rather than "governmental." Congress, in the Act itself, has defined commercial activity as follows:

A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or

---

**2.** It is noteworthy that defendants admit that the government's control of its citizens' health care "is generally excused by the entry into a contract, as in [this] case." (Def. mem. at 8.)

**3.** Specifically, 28 U.S.C. § 1604, reads in pertinent part:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act, a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in Sections 1605 to 1607 of this chapter.

particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). Numerous courts have observed that the statutory definition, read in isolation, provides little guidance, *e.g., Segni,* 835 F.2d at 163, and is indeed "somewhat circular" since it defines "commercial activity" in terms of "commercial conduct" and "commercial transaction." *Callejo,* 764 F.2d at 1108 n. 6. While the definition is broad, the Act does instruct us to consider the nature of the activity rather than its purpose. Congress did not further specify in the Act what it meant by the word "commercial." Rather, it "deliberately left the meaning open and … 'put [its] faith in the U.S. courts to work out progressively, on a case-by-case basis … the distinction between commercial and governmental.'" *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308–09 (2d Cir.1981) (quoting *Hearings on H.R. 11315 before the Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary,* 94th Cong., 2d Sess. 53 (1976) (hereafter "Hearings") (testimony of Monroe Leigh, Legal Advisor, Department of State)), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

The legislative history of the Act narrows our focus somewhat. The FSIA House Report emphasizes "that an underlying public purpose will not provide a foreign state protection for an act which is private by nature." *Segni,* 835 F.2d at 163. Specifically, the Report, H.Rep.No. 84–1487, 94 Cong.2d Sess. at 16, *reprinted at* 1976 U.S.Code Cong. & Admin.News 6604, 6615 (hereafter "Report"), states:

As the definition indicates, the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. Thus, a contract by a foreign government to provide provisions or equipment for its own forces or to construct a government building constitutes a commercial activity. The same would be true of a contract to make repairs on an embassy building. Such contracts should be considered to be commercial contracts, even if their ultimate object is to further a public function.

Contracts for the purchase of goods or services are described in several portions of the Report as activities that are generally considered commercial. The Seventh Circuit, and other circuits, have noted that the nature/purpose distinction does not draw as bright a line as would appear at first blush because the terms "nature" and "purpose" are not always easy to separate. *See, e.g., Segni,* 835 F.2d at 163–63; *De-Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1393 (5th Cir.1985) (the purpose of the Nicaragua National Bank's sale of currency reserves, "defines the conduct's nature," and is not a subsidiary consideration).

■ Despite the difficulty in discerning clear definitions or directives from Congress, the relevant case law leads us to the conclusion that defendants' activities in contracting for the sale of medical services involving kidney transplants are properly considered commercial in nature. The contract into which Greece entered with plaintiffs is "of the same character as a contract which might be made by a private person." (Report at 615.) Defendants signed a contract providing that they would tender payments to plaintiffs for medical services rendered to Greek citizens in the United States. The contract included the estimated costs of such services and bills were sent itemizing these costs to defendants through the Greek consulate in the United States. While the purpose of the contract may have been to supplement the health care available to Greek nationals within the country itself, we consider the nature and do not refer to the purpose of the agreement. Defendants characterize a contract for the sale of army boots as a commercial activity. They then go on to contend that a contract for medical services is not a commercial activity because national provision of health care services is a not-for-profit activity not normally performed by private persons and normally related to the exercise of a government's sovereign obligations. But that confuses the nature of

the activity and its purpose. An army is not normally viewed as a profit center, at least not in modern industrialized nations, and the provision of armed forces to protect the state is looked upon as a fundamental sovereign obligation rather than the proper role of the private citizens. *See State Bank of India v. NLRB*, 808 F.2d 526, 535 (7th Cir.1986). The essence of the contract here was the exchange of money for kidney transplant services and the fact that the money may have been derived from taxes levied on Greek citizens, or that all Greek citizens expect full health benefits, or that the contract may have been bigger in scope and ambition than the average contract entered into by two individuals, are auxiliary to the basic exchange and thus do not control our characterization of the activities. *See Practical Concepts*, 811 F.2d at 1550. Greece "enter[ed] into a contract to purchase goods and services [and has] avail[ed] itself of the ordinary contract machinery" by "bargain[ing] and negotiat[ing and] accept[ing] an offer. It enter[ed] into a written contract and the contract [was] to be [and was in part] performed." Hearings at 51. We thus conclude that defendants engaged in commercial activity within the meaning of § 1605(a)(2).

### B. *Statutory Jurisdiction*

■ The Supreme Court has noted that jurisdiction under the FSIA requires only "some form of substantial contact with the United States." *Verlinden*, 461 U.S. at 490, 103 S.Ct. at 1969. The FSIA authorizes the exercise of personal jurisdiction whenever subject matter jurisdiction exists under § 1330(a) and service of process has been completed in accordance with § 1608. 28 U.S.C. § 1330(b). In other words, under the FSIA "subject matter jurisdiction plus

service of process equals personal jurisdiction." *Texas Trading*, 647 F.2d at 308. Defendants do not dispute that service of process has been made pursuant to § 1608. The transplants were performed, payments for them collected and documentation of these transactions presented in the United States. In addition, plaintiffs have allegedly suffered a financial loss due to defendants' incomplete payment for services rendered under the contract. We find that these commercial activities were carried on in, and had a direct effect on, the United States, thereby meeting the jurisdictional requirement set forth in the first and third clauses of 28 U.S.C. § 1605(a)(2) of the FSIA. *See Texas Trading*, 647 F.2d at 312.

### II. *Constitutional Jurisdiction*

■ Defendants' contacts with the United States are sufficient to satisfy the due process clause. The contract was executed and performed in the United States. Defendants maintain a Greek consular office here, staffed with personnel responsible in part for recording and updating documentation of the services provided under the contract. Further, defendants used the American National Bank in Chicago to make payments under the contract. Since defendants acquired American supplies and services, paid for these services through an American office, using an American bank, and processed the paperwork pertaining to the payments and services through its American consulate, their amenability to suit in this country should have been expected. Thus, any inconvenience that defendants may suffer by litigating in this country does not militate against our assertion of jurisdiction under the due process clause. *See Texas Trading*, 647 F.2d at 315.[4]

---

**4.** In a battle of allusions to Greek mythology and history, engaged in by some of the parties in their memoranda, defendants emerge the clear winners. With some trepidation this court enters the field to suggest that the respective parties are perhaps primarily concerned with being cast in the role of the Melians. Plaintiffs, fearful that the consequences will be governed by self-interest rather than justice, are loathe to submit to the power of Athens by seeking relief

through some administrative proceeding in Greece. Defendants may fear the converse here. The present rulings, however, leave wholly open the merits of the dispute, which relate to the obligations, if any, to pay for services which may or may not have been performed, to pay amounts significantly in excess of those initially estimated, and to pay to plaintiffs amounts which may not be due to the involuntary plaintiffs.

## CONCLUSION

For the foregoing reasons, defendants' motion to quash the summons and dismiss the complaint is denied.