# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 13, 2007          Decided July 27, 2007

No. 06-7075

MOHAMED SALEM EL-HADAD,
APPELLEE

v.

UNITED ARAB EMIRATES AND
THE EMBASSY OF THE UNITED ARAB EMIRATES,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 96cv01943)

*Mary M. Baker* argued the cause for appellants.  With her on the briefs was *Haig V. Kalbian*.

*Philip M. Musolino* argued the cause for appellee.  With him on the brief were *Sylvia J. Rolinski* and *Danielle M. Espinet*

Before: TATEL, GARLAND and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: The chief question in this appeal is whether the Foreign Sovereign Immunities Act of 1976, 28

U.S.C. § 1602 *et seq.*, shields the United Arab Emirates from the wrongful termination and defamation suit of its former employee, Mohamed Salem El-Hadad, once an accountant in the U.A.E.'s embassy here in Washington, D.C. The case turns on an application of the Act's commercial activity exception. *Id.* § 1605(a)(2). Since we conclude El-Hadad was not a civil servant under the Act, and his work did not involve the exercise of distinctively governmental powers, we affirm the district court in applying the commercial activity exception and denying immunity. A relatively minor issue—the district court's failure to discount El-Hadad's future lost earnings to present value—compels us to reverse in part and remand the case solely for correction of that aspect of the damages award.

I

The facts below summarize the district court's detailed findings after a bench trial, which we set aside only if clearly erroneous. *See El-Hadad v. Embassy of U.A.E.*, No. 96-1943, 2006 WL 826098 (D.D.C. Mar. 29, 2006); FED. R. CIV. P. 52(a).

El-Hadad is an Egyptian citizen who earned a bachelor's degree in accounting in 1976 and began a career marked for many years by one promotion and positive job review after another. From 1982 to 1992, he worked as an auditor for the government of the United Arab Emirates in Abu Dhabi (not an unusual arrangement for the U.A.E., whose population between the ages of 15 and 64 numbers about 75% non-nationals, *El-Hadad v. U.A.E.*, 216 F.3d 29, 33 & n.6 (D.C. Cir. 2000)). In 1992, he formally resigned to begin work at the U.A.E.'s embassy in Washington, where he was an auditor and supervising accountant in the cultural attaché's office—and where he soon discovered that the cultural attaché, his deputy, and others were involved in embezzling no less than $2 million in U.A.E. state funds. El-Hadad exposed the embezzlement and

helped with the subsequent investigation. In 1994, he was promoted and commended for his work while the cultural attaché and his accomplices were sacked.

About a year and a half later, in 1995, El-Hadad was accused of financial impropriety in connection with the very embezzlement he had exposed. Why he was accused—for the record and the district court's opinion make clear that the accusation was baseless to the core—is a mystery, though a letter the U.A.E.'s Minister of Finance wrote on El-Hadad's behalf gives a clue: "The existing disputes between the Cultural Attaché in Washington and the . . . Ministry of Higher Education and Scientific Research have directly impacted the case of Mr. Mohammed El-Hadad . . . ." *El-Hadad*, 2006 WL 826098, at *4 (quoting Pl.'s Ex. 85). In fact, the U.A.E.'s Ambassador to the United States, the Minister of Finance, and the new cultural attaché each sent multiple letters vouching for El-Hadad's character and competence and refuting the allegations against him point-by-point—views the district court seconded in its factual findings, concluding that the documents in the record "demonstrate either that the alleged impropriety was not, in fact, improper or that if there was any fault, it lay elsewhere, such as with the embezzlers El-Hadad had detected and reported." *Id*. Nonetheless, the department named in the Minister of Finance's letter, the Ministry of Higher Education and Scientific Research, had final authority over El-Hadad's employment in the cultural attaché's office and, in 1996, ordered penal dismissal along with fines for the money El-Hadad allegedly mishandled.

After he was fired, El-Hadad briefly found work as an auditor with the U.A.E.'s military attaché, but the Ministry of Higher Education and Scientific Research viewed the job as a "circumvention of the penal termination imposed," *id*. at *5, and, in late summer 1996, had him fired again. At about the same time, a representative of the Ministry held a meeting about

El-Hadad's dismissal with the fifteen or so employees of the cultural attaché's office, announcing that El-Hadad was fired for not doing his job properly or honestly. And since then, in application after application both here and in Egypt (where he returned in 1997), El-Hadad has been rejected from every accounting job for which he has applied, always after inquiries about the circumstances in which his prior employment ended. His efforts over the last decade to find work in other fields and to start his own business have failed as well.

El-Hadad sued the U.A.E. and its Washington embassy for breach of his employment contract and defamation in August 1996, just after being fired from his job with the military attaché. Claiming immunity from suit under the Foreign Sovereign Immunities Act, the U.A.E. moved to dismiss. The district court, applying the Act's "commercial activity" exception, denied the motion. *El-Hadad v. Embassy of U.A.E.*, 69 F. Supp. 2d 69 (D.D.C. 1999) (*El-Hadad I*). On interlocutory appeal (under the collateral order doctrine), we reversed in part and remanded with a list of questions for the district court to answer before characterizing the employment relationship between El-Hadad and the U.A.E. as commercial. *El-Hadad v. U.A.E.*, 216 F.3d 29 (D.C. Cir. 2000) (*El-Hadad II*). Applying the analytic framework we had laid out, the district court once again held the commercial activity exception to apply. *El-Hadad v. Embassy of U.A.E.*, No. 96-1943 (D.D.C. July 16, 2001) (*El-Hadad III*). The parties agreed to a bench trial, after which the district court reaffirmed its decision to deny immunity and concluded on the merits that the U.A.E. breached its employment contract with El-Hadad ($1,245,961 in damages, plus interest) and defamed him ($500,000 in damages). *El-Hadad v. Embassy of U.A.E.*, No. 96-1943, 2006 WL 826098 (D.D.C. Mar. 29, 2006) (*El-Hadad IV*). The U.A.E. now appeals.

5

II

The chief issue before us is the U.A.E.'s claim to immunity under the Foreign Sovereign Immunities Act. Before passage of the 1976 Act, American courts had generally regarded foreign sovereigns as absolutely immune from suit (with exceptions where the political branches made case-specific recommendations to suspend immunity). *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 486–88 (1983) (discussing the legacy of Chief Justice Marshall's opinion in *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116 (1812)). But almost from the outset, courts recognized a distinction "between the public and governmental acts of sovereign states on the one hand and their private and commercial acts on the other." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976); *see also United States v. Planters' Bank of Ga.*, 22 U.S. (9 Wheat) 904, 907 (1824) (Marshall, C.J.) ("[W]hen a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen."). That distinction became the basis for a "'restrictive' theory of foreign sovereign immunity," a theory Congress codified in the Foreign Sovereign Immunities Act of 1976. *Verlinden B.V.*, 461 U.S. at 487. So while the Act announces that foreign states "shall be immune from the jurisdiction of the courts of the United States and of the States," 28 U.S.C. § 1604, the Act's principal effect is in the list of exceptions that follows, and the "most significant" exception, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992), the one at the heart of the restrictive theory as a whole and at issue in this appeal, is the commercial activity exception of § 1605(a)(2): "A foreign state shall not be immune . . . in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state . . . ." A state engages in commercial activity, the Supreme Court has explained (since the Act never defines the term), "where it

exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns,'" *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (quoting *Republic of Argentina*, 504 U.S. at 614) (internal quotation marks omitted).

Since El-Hadad's action is "based upon" breach of his employment contract and defamation in connection with that breach, this case involves the commercial activity exception as applied in the employment context. *See Saudi Arabia*, 507 U.S. at 357 (holding that the term "based upon" in the Act indicates "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case").[1] The Act doesn't speak directly to this context, but its legislative history does: "[P]ublic or governmental and not commercial in nature, would be the employment of diplomatic, civil service, or

---

[1] We nonetheless focus our commercial activity analysis on the employment relationship between El-Hadad and the U.A.E. embassy as a whole, rather than narrowly on El-Hadad's termination alone or separately on El-Hadad's termination and defamation. Otherwise this case might entirely defy analysis (what would be a "commercial" or "non-commercial" breach of contract?), and split off both from *El-Hadad II*, 216 F.3d at 34–36, and from other circuits' handling of FSIA challenges to wrongful termination (and related) claims, *see, e.g.*, *Kato v. Ishihara*, 360 F.3d 106, 111–12 (2d Cir. 2004); *Holden v. Canadian Consulate*, 92 F.3d 918, 921 (9th Cir. 1996); *Segni v. Commercial Office of Spain*, 835 F.2d 160, 164–66 (7th Cir. 1987). In fact, much can turn on the activity chosen for the commercial activity analysis, though the issue is not in dispute in our case. *Compare Saudi Arabia*, 507 U.S. at 358 (holding the relevant act to be misusing state police to imprison and torture a hospital worker), *with id.* at 365 (White, J., concurring) (regarding the relevant act as "run[ning] and operat[ing] a hospital"); *see also Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 465 (4th Cir. 2000) (holding the relevant act to be "how best to secure the safety of [Saudi Arabia's] leaders" in a female security agent's Title VII claim against Saudi Arabia).

military personnel," while commercial and not public or governmental in nature would be the "employment or engagement of laborers, clerical staff, or public relations or marketing agents." H.R. REP. NO. 94-1487, at 16 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6615; *see also* S. REP. NO. 94-1310, at 16 (1976) (identical language). Thus, like many of our sister circuits, we have held that a foreign government's civil servants (and diplomats and soldiers) do *not* qualify for the commercial activity exception. *El-Hadad II*, 216 F.3d at 34 (citing *Broadbent v. Organization of American States*, 628 F.2d 27, 34–36 (D.C. Cir. 1980)); *see also Kato v. Ishihara*, 360 F.3d 106, 111–12 (2d Cir. 2004); *Holden v. Canadian Consulate*, 92 F.3d 918, 921 (9th Cir. 1996); *Segni v. Commercial Office of Spain*, 835 F.2d 160, 164–66 (7th Cir. 1987). We have not and do not affirm the converse: A foreign government's employee might not be a civil servant (or diplomat or soldier) and still be engaged in quintessentially governmental work—like, for example, a judge. Thus, if El-Hadad is a civil servant, our analysis stops for we have determined that the U.A.E. is immune from his suit. If El-Hadad is not a civil servant, we go on to scrutinize whether his work involves the exercise of "powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Saudi Arabia*, 507 U.S. at 360 (internal quotation marks omitted). As we framed it in *El-Hadad II*: "[T]he operative question is whether El-Hadad was a member of the U.A.E.'s civil service" and "[t]he ultimate question . . . is whether El-Hadad's employment constituted commercial activity." 216 F.3d at 34. Of course, the first inquiry might well illuminate the second.[2]

---

[2] Not all circuits approach these questions as we do. First, while one court has, like us, expressly held that a non-civil servant (and non-diplomat, non-soldier) is not necessarily a commercial employee, *Crum v. Kingdom of Saudi Arabia*, No. 05-275, 2005 WL 3752271, at *4 (E.D. Va. July 13, 2005), another has suggested the opposite, *Holden*, 92 F.3d at 921, and still others have seemed to assume the

There is no definition of "civil service" in the Foreign Sovereign Immunities Act or its legislative history and associated case law, and there are dangers in borrowing or analogizing to get one. Our country's notion of a civil service has certain characteristic features (like merit selection, well-defined personnel procedures, and benefits), but we can't rightly expect foreign governments to either "mimic civil service protections now common to the United States" or "sacrific[e] the immunity conferred by FSIA." *Kato*, 360 F.3d at 113. And in fact, our country's notion of a civil service, conceived as an antidote to political patronage, tends to *include* "clerical staff, or public relations or marketing agents" and *exclude* many

opposite, *see, e.g.*, *Segni*, 835 F.2d at 164–65. To our eyes, the phrase in the House and Senate Reports that undergirds this area of jurisprudence, "diplomatic, civil service, or military personnel," is plainly meant to be illustrative and not exhaustive (and wouldn't make sense if read to be exhaustive). In addition, it would be difficult to square the rule that non-civil servants (and non-diplomats or non-soldiers) are *necessarily* commercial with cases thoughtfully engaging the commercial activity exception in the employment context where the civil servant (diplomat, soldier) issue simply doesn't arise. *See, e.g.*, *Janini v. Kuwait Univ.*, 43 F.3d 1534 (D.C. Cir. 1995). Second, and relatedly, not all circuits have taken the same two-stage approach we have to the operative question of whether plaintiff is a civil servant and the ultimate question of whether his activity is commercial. The Second Circuit treats the civil servant question as quite secondary ("merely [an] example[]" to be used, if at all, only to aid in making the "central" commercial/governmental distinction). *Kato*, 360 F.3d at 111. The Ninth Circuit, on the other hand, treats the civil servant question as effectively superseding the commercial/governmental distinction. *Holden*, 92 F.3d at 921. The Seventh Circuit melds the two together such that exercises of peculiarly governmental power become the chief mark of a civil servant, while exercises of power common to private citizens mark a commercial employee. *Segni*, 835 F.2d at 164–65. We think it makes most sense to conduct two separate but complementary inquiries, keeping the civil service inquiry glued to, but not subsumed by, the statutory command from which it comes.

policymakers—exactly the opposite of the House and Senate Reports' apparent aim. The notion of *public* service might be a closer proxy for that aim. On the other hand, some countries might lack the notion of a "civil service" altogether, and others might define the notion in a way far afield of FSIA's purpose. We therefore take a flexible and inclusive approach to determining whether a foreign government's employee is a civil servant. *El-Hadad II* lists five generally relevant considerations, while noting that the list is not exclusive, necessarily applicable in all cases, or, unfortunately (but unavoidably), analytically precise:

> First, how do the U.A.E.'s own laws define its civil service, and do El-Hadad's job title and duties come within that definition?
>
> Second, what was the nature of El-Hadad's employment relationship with the U.A.E.? Did he have a true contractual arrangement, or is his "contract" claim instead based, as the U.A.E. contends, solely upon the civil service laws of the U.A.E.?
>
> Third, what was the nature of El-Hadad's employment relationship when he worked in the U.A.E., and how did his subsequent employment at the Embassy relate to that prior tenure? The U.A.E. contends that El-Hadad was a long-time resident and member of its domestic civil service, who was merely "transferred" to Washington to perform the same functions (governmental audits) he had been performing at home. El-Hadad contends, on the other hand, that he quit his position in the U.A.E. and began a "new" job in the United States, "separate from his previous employment."
>
> Fourth, what was the nature of El-Hadad's work? As noted above, Congress indicated that the "employment or engagement of laborers, clerical staff or public relations or market-

ing agents" would come within the definition of commercial activity.

Fifth, what is the relevance of El-Hadad's Egyptian nationality on the facts of this case? Is the U.A.E. a country in which, as the House Report assumed, non-nationals are unlikely to be employed as governmental officers? Or does the U.A.E. often employ non-nationals in governmental positions?

216 F.3d at 34 (internal citation omitted). The district court applied this list to the facts in *El-Hadad III* and repeated the core of its analysis in *El-Hadad IV*. The task isn't easy. The evidence is meager, sometimes contradictory, and the question is exceedingly close. Thus it is of great importance in this case that the foreign sovereign has the burden of proof. *Princz v. F.R.G.*, 26 F.3d 1166, 1171 (D.C. Cir. 1994).

As to the first question, the district court found that the U.A.E. does not have a definition of "civil service," that "no such designation[] appear[s] to exist," and that the U.A.E. "does not distinguish between employees paid by the government by categorizing them as civil service employees, governmental employees, or civilian employees." *El-Hadad III*, slip op. at 4–5. Yet confusingly enough, several official U.A.E. documents in the record, including some the district court itself found probative, use the term. Perhaps these contradictory signals result from mistranslations of the documents' original Arabic. *See id.* at 5 n.3 (suggesting that the same Arabic term or terms might be translated as "civil service" or "public service"). In any case, we find it of some help that a 1994 letter from the U.A.E. embassy's cultural attaché states that El-Hadad "doesn't have the [c]ivil servant benefits." If this letter means what it appears in English to say, it is powerful evidence that El-Hadad was not a civil servant according to U.A.E. law. Even if the

letter is mistranslated, the fact that El-Hadad lacked benefits common to other U.A.E. governmental employees is sufficient for El-Hadad to prevail, if only slightly and in light of the burden of proof, on the first factor.

Turning to the second question, El-Hadad was employed in all respects pursuant to the U.A.E.'s "Local Employees Regulations for the UAE Missions Abroad 1983." While not an individualized contract, these regulations provide the clearest evidence available to us that El-Hadad should not qualify as a civil servant. First, the regulations define "local employees" as being generally "[a]dministrative employees, translators . . . mailmen, drivers, security guards, cooks, waiters, farmers, [and] maintenance" and state that local employees should almost always be nationals of the country in which the embassy is located (with exceptions for "highly exceptional" cases, like, apparently, El-Hadad's). Art. 1/3, 4/5–4/6. Plainly, these regulations are not aimed at what we or the U.A.E. would normally call a civil service. On the contrary, these regulations seem to describe the very people Congress intended the commercial activity exception for: "laborers, clerical staff," and other Americans contracting to perform ordinary commercial services in the United States for a foreign government. Second, the regulations actually refer to a civil service twice (though we note again the possibility of mistranslation), both times in discussing the special case of U.A.E. citizens employed as local employees. Art. 20/2–20/3. While not easy to interpret, the references appear to contrast local employees and civil servants, making "civil service" a status available to local employees, if at all, only if they are also citizens of the U.A.E. Now, it must be said that under the regulations, local employees (like civil servants in this country) may be terminated only for cause; El-Hadad was, under the regulations as well as according to the district court and his own testimony, a permanent employee. Nonetheless, we find the second factor tips decisively in El-

Hadad's favor.

The third question is easily answered: While El-Hadad's duties in Abu Dhabi were similar to his duties in Washington, there can be no question that he formally and completely terminated his employment in the U.A.E. before beginning work in the United States. The district court goes farther, stating that "[t]he evidence in the record suggests that El-Hadad's employment at the UAE's embassy in the District of Columbia was separate from and unrelated to his prior employment in the UAE." *El-Hadad III*, slip op. at 7. Factor three favors El-Hadad.

The fourth question is more complicated. The district court reasoned in *El-Hadad III* that, like laborers, clerical staff, and public relations or marketing agents, and unlike civil servants, El-Hadad "had no role in the creation of UAE government policy and was not privy to UAE political deliberations." Slip op. at 7–8. Elaborating on the point in *El-Hadad IV*, the district court notes El-Hadad performed only the ordinary auditing duties of any commercial accountant and that his duties, "although important and involving large sums of money, were ministerial, not discretionary." 2006 WL 826098, at *6. We agree that, to the extent El-Hadad lacked authority to determine or articulate policy and lacked discretion in his duties, he is more like the employees for whom Congress intended FSIA's commercial exception, and less like a civil servant. What gives us pause is El-Hadad's supervisory authority over at least eight other accountants in the cultural attaché's office. He was a "part of the . . . government," *Holden*, 92 F.3d at 921, in a way an administrative assistant, for example, would not be. On balance, we find his lack of discretion and exclusion from any policy-making role outweighs his supervisory role. Thus factor four resolves in El-Hadad's favor as well—though by a very narrow margin indeed.

The fifth question concerns an issue of central importance in *El-Hadad II*, though not here. The sentence in the House and Senate Reports classifying civil service work as governmental states in full: "Also public or governmental and not commercial in nature, would be the employment of diplomatic, civil service, or military personnel, but not the employment of American citizens or third country nationals by the foreign state in the United States." H.R. REP. NO. 94-1487, at 16 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6615; *see also* S. REP. NO. 94-1310, at 16 (1976) (identical language). At one point, in dicta, we read this language to imply a per se rule that Americans and third country nationals, even if employed by a foreign state as civil servants, count as commercial employees. *Broadbent*, 628 F.2d at 34 (D.C. Cir. 1980). The district court's decision on the U.A.E.'s immunity in *El-Hadad I* turned on this dictum. 69 F. Supp. 2d at 74–76. But in *El-Hadad II*, impressed with the situation of small countries like the U.A.E. that at times employ non-nationals in high governmental positions, we rejected *Broadbent*'s per se rule and held that "a foreign state can engage in noncommercial (i.e., governmental) activity through third country nationals." 216 F.3d at 33. Thus the relevance of a plaintiff's nationality for the civil service inquiry becomes a matter of context. Where a country rarely if ever hires non-citizens for its civil service (unlike the U.A.E.), non-citizenship strongly indicates that someone is *not* a civil servant. And in our view, citizenship makes someone more likely to qualify as a civil servant even if a country sometimes hires non-citizens as civil servants. *Accord Segni*, 835 F.2d at 165 n.7 ("[A] person hired by his own country's government to work abroad should have a somewhat lesser expectation of suing his homeland in his host nation's courts."). Thus, were El-Hadad a U.A.E. citizen, the U.A.E. might press its advantage, and were non-citizens rarely if ever U.A.E. civil servants, El-Hadad might press his. As it is, El-Hadad's nationality is all but irrelevant.

Multifactor tests tend to be inconclusive, but the evidence here suggests El-Hadad is *not* a civil servant—and were the inquiry totally inconclusive, that very fact, together with the U.A.E.'s burden of proof, would decide the matter in El-Hadad's favor. We therefore hold that El-Hadad is not a civil servant and move on to the ultimate question of whether his work involved the exercise of "powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Saudi Arabia*, 507 U.S. at 360 (internal quotation marks omitted). In so doing, we bear in mind a limiting principle from the statute: "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). One could question whether it is possible to determine the nature of a human activity without reference to its purpose, *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1393 (5th Cir. 1985) ("Often, the essence of an act is defined by its purpose—gift-giving, for example."), but the Supreme Court has insisted that the statutory command be carried out, *Republic of Argentina*, 504 U.S. at 617 ("[The 5th Circuit's] argument is squarely foreclosed by the language of FSIA."), which in practice means rejecting any argument that rests on the foreign state's *reasons* for undertaking the activity alleged to be commercial, *id.* ("[I]t is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so." (emphasis in original)). We cannot attend to whether a foreign government aims to make a profit or protect its borders, whether El-Hadad's work aimed to carry out an international political program or to keep the cultural attaché's office supplied with pens and pencils. We can look only to the resemblance between "the outward form" of his conduct and powers and those of private citizens. *Id.*

15

One distinctive mark of governmental work is discretionary involvement with sovereign law or policy. According to the district court (and we see no reason to disturb its conclusions), El-Hadad had no role in the creation of governmental policy, and to the extent he carried it out, his duties were "ministerial, not discretionary." *El-Hadad IV*, 2006 WL 826098, at *6. Instead, El-Hadad did standard accounting work—"auditing expenditures, reviewing accounting methods, reconciling bank statements or employing auditors to conduct these activities," *id.* at *7—of a character easily found in commercial enterprise. We therefore affirm the district court's conclusion that El-Hadad's employment was commercial rather than governmental, and agree El-Hadad's suit is authorized under the Foreign Sovereign Immunity Act's commercial activity exception.

III

The U.A.E. raises six other challenges to the district court's rulings, five of which obviously fail and one of which just as obviously succeeds.

At trial, El-Hadad testified over objection that prospective employers asked him why he left his job with the U.A.E.'s embassy and told him they could not hire him due to his penal termination. This was hearsay, the U.A.E. argues, and the district court's findings of fact relied on it. But the testimony was hearsay only to the extent the district court used it for the truth of the matter asserted, and there is only one substantial respect in which the court might have done so: to show the U.A.E.'s defamation caused El-Hadad professional injury. Since the district court found defamation *per se* under D.C. law, *id.* at *15–16, that injury was presumed and any error was harmless. *See* FED. R. CIV. P. 61.

The U.A.E. complains in two respects about the district court's treatment of documentary evidence. First, the U.A.E. claims the district court admitted into evidence at trial documents undisclosed during discovery. But those documents, which concerned arcane intricacies of the embezzlement El-Hadad exposed, were apparently at issue in substance during discovery; in any case, nothing in the district court's opinion turned on their obscurities. Second, the U.A.E. claims the district court's opinion relies on a pair of documents never properly admitted into evidence at trial. Both documents, however, concern whether El-Hadad qualifies as a civil servant and were properly submitted to and used by the court in *El-Hadad III*; the court referenced them again in *El-Hadad IV* only by way of reiterating its past work. We find no error or only harmless errors in these matters. *See* FED. R. CIV. P. 61.

The U.A.E. claims El-Hadad's testimony from Egypt by Internet video violated Federal Rule of Civil Procedure 43(a), which requires "good cause" and "appropriate safeguards" before a witness is permitted to testify "by contemporaneous transmission from a different location." But before permitting the testimony, the district court insisted that El-Hadad prove he had pursued and repeatedly been denied a visa to the United States (as well as show careful preparations for translation and teleconferencing). The U.A.E. retreats to the argument that El-Hadad's testimony was effectively unsworn because, with no extradition treaty between the United States and Egypt, El-Hadad could not be prosecuted for perjury. But this argument's only direct support comes from *Harrell v. State*, 709 So. 2d 1364, 1371 (Fla. 1998), which concerns the very different issues at stake in applying the Sixth Amendment's Confrontation Clause in the criminal context. In fact, Rule 43 permits video testimony, and its criminal equivalent (Federal Rule of Criminal Procedure 26) doesn't, precisely because the Supreme Court found the criminal context too sensitive for the same rule. *See*

*Order of the Supreme Court*, 207 F.R.D. 89, 93–96 (2002) (Scalia, J.); *United States v. Yates*, 438 F.3d 1307, 1314–15 (11th Cir. 2006).

El-Hadad's breach of contract claim required overcoming the District of Columbia's usual presumption of at-will employment. *Sisco v. GSA Nat'l Capital Fed. Credit Union*, 689 A.2d 52, 54–55 (D.C. 1997). A properly distributed employee manual with specific termination provisions can do the job, *id.*; *see also Byrne v. Nat'l R.R. Passenger Co.*, 184 Fed. Appx. 6 (D.C. Cir. 2006) (unpublished per curiam), and the district court found the Local Employees Regulations—whose termination provisions provide for dismissal where, for example, an employee's dereliction of duty destroys valuable embassy property or compromises official documents, Art. 17/7—to qualify, *El-Hadad IV*, 2006 WL 826098, at *11. The U.A.E. counters, primarily, that the evidence showing the Regulations to have been distributed was too weak for the district court's conclusion. The evidence *is* weak—at least it is vague—but El-Hadad himself testified to distribution, and several other witnesses supported the claim. That is enough under our "clearly erroneous" standard of review. FED. R. CIV. P. 52(a).

Finally, the U.A.E. attacks El-Hadad's defamation claim, arguing in the main that the common interest privilege protects all the U.A.E.'s written and spoken statements about El-Hadad's dishonesty. But bad faith vitiates the privilege under D.C. law, *Moss v. Stockard*, 580 A.2d 1011, 1024–25 (D.C. 1990), and we have not the slightest difficulty affirming the district court's findings of bad faith, *El-Hadad IV*, 2006 WL 826098, at *16–17.

Thus we come to the U.A.E.'s complaints about damages—principally that the district court failed to discount El-Hadad's future lost earnings to present value. We agree.

"The measure of damages in an employee's action against his employer for breach of the employment contract is generally the compensation 'that would have been due to the employee during the unexpired period of employment *with appropriate reduction to present worth*.'" *Hodge v. Evans Fin. Corp.*, 823 F.2d 559, 569 (D.C. Cir. 1987) (emphasis added) (internal quotation mark omitted) (quoting *District of Columbia v. Jones*, 442 A.2d 512, 524 (D.C. 1982). The district court here noted the requirement, *El-Hadad IV*, 2006 WL 826098, at *12, but in the event appears to have overlooked it, *id.* at *13 n.14. We therefore must reverse in part and remand solely for the district court to perform this task. In all other respects, the district court is affirmed.

*So ordered.*