**Mohamed Salem EL–HADAD, Appellee,**

**v.**

**UNITED ARAB EMIRATES and The Embassy of the United Arab Emirates, Appellants.**

**No. 99–7220.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 2000.

Decided June 16, 2000.

---

James M. Johnstone argued the cause for appellant. John P. Szymkowicz was on the brief for appellant.

Sylvia J. Rolinski argued the cause and filed the brief for appellee.

Before: GINSBURG, TATEL, and GARLAND, Circuit Judges.

Opinion of the court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Plaintiff Mohamed Salem El–Hadad is a citizen of Egypt and a former employee of the Embassy of the United Arab Emirates located in Washington, D.C. After his employment was terminated, El–Hadad sued both the Embassy and the United Arab Emirates (collectively, "the U.A.E.") for alleged breach of contract and defamation.[1] The U.A.E. moved to dismiss, asserting immunity from suit under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq.* The district court denied the U.A.E.'s motion on the pleadings, holding that the employment relationship between the U.A.E. and El–Hadad came within the "commercial activity" exception to sovereign immunity because El–Hadad was not a national of the U.A.E. The court also rejected the U.A.E.'s contention that even if plaintiff's suit fell within the "commercial activity" exception, the FSIA contains an "exception to that exception" for defamation claims.

The U.A.E. appeals from the denial of its motion to dismiss. We conclude that there are factual questions that must be resolved before the relationship between El–Hadad and the U.A.E. can be characterized as commercial rather than governmental, and we therefore reverse in part and remand for further proceedings. We agree with the district court, however, that if El–Hadad's action is based upon commercial activity, the U.A.E. is not immune from his claim for defamation.

## I

The denial of a foreign state's motion to dismiss on the ground of sovereign immunity is subject to interlocutory appeal under the collateral order doctrine. *See Transamerica Leasing, Inc. v. La Republica de Venezuela,* 200 F.3d 843, 847 (D.C.Cir.2000). Because the district court decided the motion on the pleadings, our standard of review is de novo. *See id.*

The FSIA provides the sole avenue by which American courts can obtain jurisdiction over foreign states. *See Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 611, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). Under the FSIA, a foreign state is immune from the jurisdiction of our courts unless certain statutory exceptions are met. *See* 28 U.S.C. §§ 1604–1605. The principal exception at issue here is that for "commercial activity." The Act provides that a "foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case— ... (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state...." *Id.* § 1605(a).

Our precedent makes clear that the employment of personnel by a foreign state is not per se commercial activity under the FSIA.[2] In *Broadbent v. Orga-*

---

1. The complaint also named three individuals acting in their official capacities. The district court granted the individuals' motion to dismiss for lack of personal jurisdiction, *see El–Hadad v. Embassy of U.A.E.,* 69 F.Supp.2d 69, 76–79 (D.D.C.1999), and that decision is not at issue in this appeal.

2. The FSIA provides that: "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). As the Supreme Court recognized in *Weltover,* however, this definition

"leaves the critical term 'commercial' largely undefined." 504 U.S. at 612, 112 S.Ct. 2160. The sentence "merely specifies what element of the conduct determines commerciality (i.e., nature rather than purpose), but still without saying what 'commercial' means." *Id.* The Court concluded that the defining "issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Id.* at 614, 112 S.Ct. 2160 (internal quotation marks and citation omitted).

*nization of American States,* applying an analysis based on the FSIA, we held that the firing of staff members of the General Secretariat of the Organization of American States (OAS) was not commercial activity and therefore that the OAS was immune from suit for improper discharge. *See* 628 F.2d 27, 35 (D.C.Cir.1980). In support, we cited the House Report on the FSIA, which states in part: "Also public or governmental and not commercial in nature, would be the employment of diplomatic, civil service, or military personnel...." H.R.Rep. No. 94–1487, at 16 (1976), U.S.Code Cong. & Admin.News 1976, 6604, at 6615.[3] The words replaced by the ellipses in this quotation will soon become important, but for now it is enough to note that, as we concluded in *Broadbent,* the "report clearly marks employment of civil servants as noncommercial for purposes of restrictive immunity." 628 F.2d at 34.[4]

The U.A.E. contends that El–Hadad was a civil servant of the U.A.E., and that his firing is therefore noncommercial and immune from suit in our courts. Although El–Hadad is an Egyptian citizen, it is uncontested that he worked for the government of the U.A.E. for sixteen years.[5] For the first thirteen of those years, he worked in the U.A.E. as an auditor. Beginning in January of 1993, El–Hadad worked as an auditor in the Cultural Division of the U.A.E.'s Embassy in Washington. The U.A.E. terminated El–Hadad's employment in February 1996. El–Hadad alleges that he was terminated after he uncovered misappropriation of U.A.E. public funds. The U.A.E. disputes this allegation, but contends that even if it were true,

the auditing function El–Hadad performed is the work of a civil servant and the U.A.E. is therefore immune from suits arising from such activity.

The district court held that regardless whether El–Hadad was a member of the U.A.E.'s civil service, his employment would nonetheless constitute commercial activity because he is not a U.A.E. national. The court based that conclusion on language in our *Broadbent* opinion, which stated that there is "an exception from the general rule" that civil service employment is noncommercial "in the case of employment of American citizens or third country nationals by foreign states." *Broadbent,* 628 F.2d at 34. The district court did note, however, that other circuits have not invoked such an exception. Instead, those courts examine the specifics of the employment relationship for indicia of civil service, treating the employee's nationality—if they consider it at all—as a non-dispositive factor. *See Holden v. Canadian Consulate,* 92 F.3d 918, 920–22 (9th Cir.1996) (examining details of American's employment with Canadian Consulate to determine whether Consulate was immune on ground that plaintiff was member of civil service); *Segni v. Commercial Office of Spain,* 835 F.2d 160, 165 & n. 7 (7th Cir.1987) (noting that nationality can be a factor, but deciding the case by reference to specifics of employment relationship rather than fact of third country nationality).

We cannot fault the district court for its legal conclusion, resting, as it did, on the language of *Broadbent.* But that language was plainly dictum, not necessary to decide the case and therefore not binding upon

---

**3.** The Senate Report contains the same language, both on this point and on the others quoted below. *See* S.Rep. No. 94–1310, at 16 (1976); *see also id.* at 20–21.

**4.** That point distinguishes *Broadbent* from *Janini v. Kuwait University,* 43 F.3d 1534 (D.C.Cir.1995), in which we held that the firing of teachers at Kuwait University came within the commercial activity exception. There was no claim in that case that the

teachers were civil servants of the government of Kuwait.

**5.** The district court decided the motion to dismiss on the pleadings, and we therefore assume that this and the following facts, taken from ¶ 9 of the complaint, are true. *See Saudi Arabia v. Nelson,* 507 U.S. 349, 351, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). In any event, except where noted, the U.A.E. does not contest their validity.

us. *See, e.g., United States v. Torres,* 115 F.3d 1033, 1036 (D.C.Cir.1997). While *Broadbent* did opine that third country nationality would be dispositive in a case involving a sovereign state, *Broadbent* itself involved an international organization. Notwithstanding that some of the plaintiffs were Americans, the court declined to apply a "third country nationality" exception to the civil service rule in that case, reasoning that since an international organization has no nationals of its own, applying such an exception in the context of international organizations would "swallow up the rule of immunity for civil service employment disputes." *Broadbent,* 628 F.2d at 34.

■ Now that we are squarely faced with the question, we conclude that a per se rule of non-immunity for a foreign state's employment of third country nationals is inconsistent with Congress' intent to immunize foreign governmental activity from suit in American courts. Indeed, when pressed at oral argument, both sides appeared to agree. Both concurred, for example, that if El–Hadad had been the U.A.E.'s ambassador to the United States, the U.A.E. would have immunity for firing him despite his Egyptian nationality. Nor, apparently, is this scenario particularly far-fetched. Both parties agreed that small countries such as the U.A.E. do, at times, employ nationals of other countries (and particularly citizens of regional neighbors) in high governmental positions.[6]

We now return to the ellipses noted above. The full quotation from the House Report is as follows: "Also public or governmental and not commercial in nature, would be the employment of diplomatic, civil service, or military personnel, but not the employment of American citizens or third country nationals by the foreign state in the United States." H.R.Rep. No. 94–1487, at 16, U.S.Code Cong. & Ad-

min.News 1976, at 6615. *Broadbent* read the language beginning with "but not" (for which we substituted the ellipses above) as creating a per se exception from the general rule that civil service employment is governmental rather than commercial. *See Broadbent,* 628 F.2d at 34. That is surely a reasonable interpretation. But we think it at least as likely that Congress was attempting to contrast civil service (and diplomatic and military employment, not at issue here) with non-civil service employment, operating on the assumption that it was unlikely a country would employ an American or third country national in such a position. This view of the legislative history is bolstered by the next paragraph of the House Report, which lists, as additional examples of commercial activity, a foreign government's "employment or engagement of laborers, clerical staff or public relations or marketing agents," H.R.Rep. No. 94–1487, at 16, U.S.Code Cong. & Admin.News 1976, at 6615—job categories which Congress apparently also thought unlikely to be occupied by members of a government's civil service.

In any event, the language that must control our decision is that of the statute rather than of the somewhat muddy legislative history. Under the FSIA, the immunity exception depends solely on whether the action is based upon a "commercial activity," without any mention of the nationality of the participants. *See* 28 U.S.C. § 1605(a)(2). We have no warrant, therefore, for formulating a test that turns solely on nationality. To the contrary, because under the usual understanding of the terms a foreign state can engage in noncommercial (i.e., governmental) activity through third country nationals, the statutory language dictates that the inquiry cannot end with the fact that the employee is not a citizen of the employing state. At oral argument, both parties agreed.

---

**6.** An estimated 75% of the U.A.E.'s population between the ages of 15 and 64 consists of non-nationals. *See* CIA, The World

Fact Book 1999, at 504 (available at <http://www.odci.gov/cia/publications/factbook/tc.html>).

## II

■ Because defendants' motion was dismissed on the pleadings, we remand the case to the district court to undertake a further inquiry. The ultimate question to be answered is whether El–Hadad's employment constituted commercial activity. As we held in *Broadbent,* the employment of civil servants is noncommercial for purposes of the FSIA. *See Broadbent,* 628 F.2d at 34–36. Hence, the operative question is whether El–Hadad was a member of the U.A.E.'s civil service. In order to guide the proceedings on remand, we suggest some questions that appear relevant to making that determination in this case. We do not regard them as an exclusive list, nor as necessarily applicable in all cases.

First, how do the U.A.E.'s own laws define its civil service, and do El–Hadad's job title and duties come within that definition?

Second, what was the nature of El–Hadad's employment relationship with the U.A.E.? Did he have a true contractual arrangement, or is his "contract" claim instead based, as the U.A.E. contends, solely upon the civil service laws of the U.A.E.?

Third, what was the nature of El–Hadad's employment relationship when he worked in the U.A.E., and how did his subsequent employment at the Embassy relate to that prior tenure? The U.A.E. contends that El–Hadad was a long-time resident and member of its domestic civil service, who was merely "transferred" to Washington to perform the same functions (governmental audits) he had been performing at home. El–Hadad contends, on the other hand, that he quit his position in the U.A.E. and began a "new" job in the United States, "separate from his previous employment."

Fourth, what was the nature of El–Hadad's work? As noted above, Congress indicated that the "employment or engagement of laborers, clerical staff or public relations or marketing agents" would come within the definition of commercial activity. H.R.Rep. No. 94–1487, at 16, U.S.Code Cong. & Admin.News 1976, at 6615.

Fifth, what is the relevance of El–Hadad's Egyptian nationality on the facts of this case? Is the U.A.E. a country in which, as the House Report assumed, nonnationals are unlikely to be employed as governmental officers? Or does the U.A.E. often employ non-nationals in governmental positions?

We appreciate that this multi-factor inquiry is not analytically precise. That is a consequence of Congressional preferences, however, rather than our own. Congress expressly concluded that it was "unwise to attempt an excessively precise definition" of "commercial activity," and chose instead to give the "courts ... a great deal of latitude in determining what is a 'commercial activity' for purposes of" the FSIA, providing only a few (sometimes conflicting) examples of the kinds of employment it regarded as falling within that category. *Id.* at 16, U.S.Code Cong. & Admin.News 1976, at 6615. Although the Supreme Court has repeatedly lamented this situation, *see Saudi Arabia v. Nelson,* 507 U.S. 349, 359, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (noting that the FSIA "leaves the critical term 'commercial' largely undefined") (quoting *Weltover,* 504 U.S. at 612, 112 S.Ct. 2160), it has also noted that courts "do not have the option to throw up [their] hands" and must instead accept "judicial responsibility to determine what a 'commercial activity' is for purposes of the Act." *Id.*

## III

■ The U.A.E. contends that even if its termination of El–Hadad were regarded as coming within the "commercial activity" exception to sovereign immunity, plaintiff's claim that he was defamed in connection with that termination would nonetheless have to be dismissed under a "defamation" exception to that exception. As the district court correctly held, howev-

er, defamation is not an "exception to the exception" for commercial activity, but rather an exception to a separate FSIA exception for noncommercial torts.

The FSIA provides that a "foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case" in which one of several exceptions applies. 28 U.S.C. § 1605(a). The second exception, contained in paragraph (2) of § 1605(a), is the one considered above: any case "in which the action is based upon commercial activity carried on in the United States by the foreign state." *Id.* § 1605(a)(2). Paragraph (2) does not contain a defamation exception to its commercial activity exception. There is, therefore, no indication that defamation arising out of a commercial activity is immune from suit.

It is the fifth exception to immunity, contained in paragraph (5) of § 1605(a), that is implicated by the U.A.E.'s argument here. That paragraph applies to any case "not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for ... damage to or loss of property occurring in the United States and caused by the tortious act or omission of that foreign state." *Id.* § 1605(a)(5). Unlike the exception for commercial activity, this tort exception does contain an exception for, inter alia, defamation: "[T]his paragraph," the FSIA states, "shall not apply to ... any claim arising out of ... libel, [or] slander...." *Id.* § 1605(a)(5), (a)(5)(B).

The U.A.E. contends that the defamation exception to paragraph (5) is applicable not only to the torts covered by that paragraph, but also to the commercial activity covered by paragraph (2). That reading, however, is expressly contradicted by the language of the statute. As just quoted, paragraph (5) begins by stating that it applies only to cases "not otherwise encompassed in paragraph (2) above," i.e., only to those tort cases not encompassed by the commercial activity paragraph. And in subsequently introducing its own exceptions, paragraph (5) goes on to state

that "*this* paragraph"—i.e., paragraph (5)—"shall not apply to" libel or slander. *Id.* § 1605(a)(5), (a)(5)(B) (emphasis added). The language therefore makes clear that paragraph (5) and its defamation exception are inapplicable to tort cases based upon commercial activity.

This reading is confirmed by the legislative history, which repeatedly refers to the category encompassed by paragraph (5) as "*non*commercial torts." H.R.REP. No. 94–1487, at 20, 21 (emphasis added); *see Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (referring to § 1605(a)(5) as the "noncommercial torts exception"); *cf. Nelson,* 507 U.S. at 361–62, 113 S.Ct. 1471 (finding that the tortious activity alleged in that case, wrongful arrest by Saudi police, failed to qualify as commercial activity because it was "not the sort of action by which private parties can engage in commerce"). Paragraph (5), the House Report states, "is directed primarily at the problem of traffic accidents but is cast in general terms as applying to all tort actions for money damages, *not otherwise encompassed by section 1605(a)(2) relating to commercial activities.*" H.R.REP. No. 94–1487, at 20–21, U.S.Code Cong. & Admin.News 1976, at 6619 (emphasis added). Its "purpose," the Report continues, "is to permit the victim of a traffic accident or other noncommercial tort to maintain an action against the foreign state to the extent otherwise provided by law." *Id.* at 21, U.S.Code Cong. & Admin.News 1976, at 6620.

This reading is also consistent with the case law. This circuit has previously stated that the exceptions to paragraph (5) do not limit the commercial activity exception. *See Gilson v. Republic of Ireland,* 682 F.2d 1022, 1028 n. 27 (D.C.Cir.1982) (stating that 28 U.S.C. § 1605(a)(5)(B) "does *not* limit *id.* § 1605(a)(2)"). Those of our sister circuits that have considered the question have reached the same conclusion. *See Southway v. Central Bank of Nigeria,* 198 F.3d 1210, 1219 (10th Cir.1999); *Ex-*

*port Group v. Reef Industries, Inc.*, 54 F.3d 1466, 1473–77 (9th Cir.1995); *see also Letelier v. Republic of Chile*, 748 F.2d 790, 795 (2d Cir.1984) (noting that the statutory language "suggests that the commercial activity exception to jurisdictional immunity under paragraph (2) and the tort exception under (5) are mutually exclusive"). Accordingly, we affirm the district court's decision that activity encompassed by the waiver of sovereign immunity contained in 28 U.S.C. § 1605(a)(2) does not become subject to suit by virtue of the provisions of § 1605(a)(5)(B).[7]

## IV

The decision of the district court is reversed in part and the case is remanded for further proceedings consistent with this opinion.

---

7. We reject the U.A.E.'s argument that foreign sovereigns should be immune from actions for defamation under the FSIA because the United States is immune from such actions under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(h). Although both statutes contain defamation exceptions, *see* H.R. REP. No. 94–1487, at 21, the analogy becomes inapposite when applied in the context of the FSIA's commercial activity exception because there is no comparable immunity exception under the FTCA. *See Export Group*, 54 F.3d at 1476 (describing FSIA's commercial activity exception as "ha[ving] no counterpart in the FTCA").