# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 24, 2014            Decided July 31, 2015

No. 13-7088

DEVINCCI SALAH HOURANI AND ISSAM SALAH HOURANI,
APPELLANTS

v.

ALEXANDER V. MIRTCHEV AND KRULL CORPORATION,
APPELLEES

Consolidated with 13-7089

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01618)

*Howard W. Foster* argued the cause for appellants/cross-appellees.  With him on the briefs was *Louis G. Adolfsen.*

*Jeffrey A. Lamken* argued the cause for appellees/cross-appellants.  On the briefs were *Warren W. Harris*, *Jeffrey L. Oldham*, *Richard W. Beckler*, *Stephen Sale*, and *John D. Quinn.  G. Robert Blakey* and *LaShon Kell* entered appearances.

Before: TATEL, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:  Two Kazakh businessmen claim that the daughter of the President of Kazakhstan extorted hundreds of millions of dollars' worth of their business assets in Kazakhstan.  She did so, they claim, with the help of the defendants in this case, Alexander Mirtchev and his District of Columbia-based business, Krull Corporation.  At the heart of the dispute is whether the complaint alleges sufficient domestic misconduct by Mirtchev and Krull Corporation to state a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, the Hobbs Act, 18 U.S.C. § 1951, or District of Columbia defamation law.  The district court dismissed the complaint for failure to state a claim.  The court also denied a motion for sanctions filed by Mirtchev and Krull Corporation.  We affirm.

# I

## Statutory Framework

### *RICO*

Congress enacted the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, commonly known as "RICO," to "eradicat[e] * * * organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime," *United States v. Turkette*, 452 U.S. 576, 588 (1981) (quoting Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 923 (Oct. 15, 1970)).

To that end, RICO authorizes both criminal penalties, 18 U.S.C. § 1963, and civil remedies, *id.* § 1964, against those who engage in a "pattern of racketeering activity" through or involving an "enterprise," *id.* § 1962. "[R]acketeering activity" means the commission or threatened commission of any of a long list of state and federal crimes, including "murder, kidnapping, * * * robbery, bribery, extortion," and witness tampering. *Id.* § 1961(1).

RICO, however, only targets a "pattern" of such racketeering activity, which means the commission of at least two acts of racketeering within a certain period of time (generally ten years). 18 U.S.C. § 1961(5). The commission of those acts must be through an "enterprise," which is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" *Id.* § 1961(4).

As relevant here, RICO prohibits "any person employed by or associated with any enterprise" that affects interstate or foreign commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. § 1962(c), or conspiring to do so, *see id.* § 1962(d).

In addition to criminal penalties enforced by the United States, RICO authorizes "[a]ny person injured in his business or property by reason of a violation [of the statute]" to sue in federal district court and "recover threefold the damages he sustains and the cost of the suit[.]" 18 U.S.C. § 1964(c).

### *Hobbs Act*

The Hobbs Act makes it a crime to "in any way or degree obstruct[], delay[], or affect[] commerce or the movement of

any article or commodity in commerce, by robbery or extortion," as well as to "conspire[] so to do." 18 U.S.C. § 1951(a). The term "extortion" in the Hobbs Act means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2).

The "commerce" that the Hobbs Act polices is all "commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." *Id.* § 1951(b)(3).

## II

## Factual Background

Because the court below dismissed the case for failure to state a claim, we accept the following facts, drawn from the amended complaint, as true. *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014).

Devincci Hourani and his brother Issam Hourani are businessmen who previously owned "oil, broadcasting, and publishing companies" in the Republic of Kazakhstan. Amended Complaint ¶ 11. As relevant here, Devincci, Issam, and Issam's wife, Gulshat, owned shares in KTK Television and Alma Media Conglomerate, "the largest media holding company in Kazakhstan." *Id.* ¶¶ 14, 17. Their holdings in Kazakhstan, including those media properties, were worth "hundreds of millions, perhaps billions, of dollars." *Id.* ¶ 28.

Trouble began for the Houranis in June 2007, when armed agents of the KNB (the Kazakh offshoot of the KGB) raided the Hourani family's offices. Amended Complaint ¶¶ 18–20. In the following weeks, "pressure from various authorities mounted" under the direction of Dariga Nazarbayeva, daughter of Kazakhstan's President, Nursultan Nazarbayev. *Id.* ¶¶ 20–21.[1] Devincci met with Nazarbayeva in July 2007, and she then "offered to use her influence with the government to try to 'protect' his family's businesses from further harassment if he would sign over his family's shares in the mass media companies in which they held interests[.]" *Id.* ¶ 21. Devincci, "believ[ing] that he had no choice but to capitulate to her demand," *id.* ¶ 22, and acting "under duress," signed the paperwork to turn over his, Issam's, and Gulshat's shares in KTK and Alma Media "to Dariga for her use," *id.* ¶ 23. Elsewhere, though, the amended complaint alleges that Devincci signed over the shares to the "First Presidential Fund." *Id.* ¶ 21. The amended complaint does not explain what that Fund is or whether Dariga Nazarbayeva controls it.

According to the amended complaint, Nazarbayeva, who "had no official title in Kazakhstan," Amended Complaint ¶ 34, was attempting "to amass ownership of the nation's major media outlets" in "contemplat[ion of] a political career as a possible successor to her father," *id.* ¶ 12. She thus "sought to have the media portray her in the most favorable

---

[1] The amended complaint refers to Nazarbayeva as "Dariga Nazarbayev" or "Dariga." *See, e.g.*, Amended Complaint ¶¶ 12, 21. Her surname is most commonly written with an "a" on the end. *See*, *e.g.*, http://www.akorda.kz/en/republic_of_kazakhstan/ president (official website of President Nazarbayev) (last visited July 24, 2015). For clarity, and to distinguish her from President Nazarbayev, this opinion refers to her as "Nazarbayeva."

light," as well as to secure "the vast wealth and ownership such large businesses would confer." *Id.*

The complaint further alleges that Dariga sought the assistance of the defendants in this case, Alexander Mirtchev and his "global strategic solutions" consulting firm, Krull Corporation. Amended Complaint ¶ 13. Both Mirtchev and Krull Corporation are based in Washington, D.C. *Id.* Nazarbayeva's plan to amass control of Kazakh media was alleged to be "consistent with" Mirtchev's earlier recommendation to President Nazarbayev, made "in a memorandum informally known as the 'Superkhan' document, in which Mirtchev had counseled the President of Kazakhstan on how he could consolidate power for himself and his family at the expense of business leaders." *Id.* ¶ 15.

According to the complaint, Mirtchev agreed to help Nazarbayeva gain control of the Houranis' assets. His specific role in the scheme is alleged to have taken three forms. Amended Complaint ¶ 16. First, he "agreed to assist [Nazarbayeva] with monetizing her control" of the Houranis' assets. *Id.* Second, he agreed to "deposit some of the proceeds of the seized businesses in western bank accounts where it would not be taxed or otherwise scrutinized." *Id.* Third, "Mirtchev agreed to use his influence to falsely brand the Houranis as international criminals and terrorists." *Id.*

**Procedural History**

The Hourani brothers filed suit against Mirtchev and Krull Corporation in the United States District Court for the District of Columbia in September 2010. That first complaint gave a somewhat different version of events. In particular, the initial complaint had the Kazakh Government, rather than Dariga Nazarbayeva, expropriating the Houranis' assets. *See*

Original Complaint ¶¶ 106, 126. The expropriation was alleged to be a specific step in executing the plan outlined in the "Superkhan memorandum," rather than merely "consistent with" it. *Compare* Original Complaint ¶ 131, *with* Amended Complaint ¶ 15.

Other documents that the Houranis filed initially with the district court purportedly tied Mirtchev to the Superkhan memorandum, including a letter from the Deputy Prosecutor General of Kazakhstan, Ashkat Daulbaev, to the Kazakh Ambassador to the United States, that identified Mirtchev as responsible for the campaign of intimidation and expropriation against the Houranis. *See* Houranis' Opposition to Initial Motion to Dismiss ¶ 19; Declaration of Devincci Hourani ¶¶ 16–20 **[JA 289–290]**; Declaration of Issam Hourani ¶ 30. **[JA 279]**

Mirtchev and Krull Corporation challenged the Daulbaev letter and other documents as forgeries and moved to dismiss the complaint. The Houranis then filed an amended complaint, which is the version at issue in this appeal. As amended, the complaint contains no mention of the Daulbaev letter, although it does still reference the Superkhan memorandum. The complaint now alleges that Mirtchev conspired to, and did, violate RICO by engaging in criminal activity through the Krull Corporation, in violation of 18 U.S.C. § 1962(c) and (d). Amended Complaint ¶¶ 42–52. The specific predicate racketeering crimes alleged are money laundering, in violation of 18 U.S.C. § 1956, and extortion, in violation of the Hobbs Act, *id.* § 1951. Amended Complaint ¶ 44.

Lastly, the amended complaint alleges that Mirtchev conspired to defame the Houranis by "publish[ing] or caus[ing] * * * to be published" defamatory statements,

including that the Houranis were members and supporters of the terrorist group Hamas. Amended Complaint ¶ 59. Those statements were allegedly published on the Kazakh embassy website, in "a Forbes.com editorial," in "internal Kazakh Government memoranda," in "the so-called Aliyev Dossier published by [the] Eurasian Transition Group," and in "various other Internet publications." *Id.*

The district court dismissed the case with prejudice, reasoning that "the predicate acts that proximately caused [p]laintiffs' injury—namely, the extortion *in Kazakhstan by a Kazakh actor* of Plaintiffs' *Kazakhstan-based* assets—were squarely extraterritorial and therefore outside of RICO's reach." *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 168 (D.D.C. 2013). The court also held that the defamation claims were too vague to allow for responsive pleadings, and thus failed to state a claim. *Id.* at 169. However, the court denied the defendants' motion to impose sanctions on the plaintiffs under Federal Rule of Civil Procedure 11 for filing contradictory versions of the complaint and for relying on allegedly forged documents. The court noted that an objective test applies to finding a Rule 11 violation, but did not determine whether there had been a violation, "choos[ing] not to impute bad faith on the part of the [p]laintiffs" and "finding ample grounds for dismissing the complaint on the substantive grounds" already given in the opinion. *Id.* at 172.

## III

## Analysis

### *Jurisdiction*

The district court had federal-question jurisdiction over the Houranis' RICO and Hobbs Act claims and supplemental jurisdiction over the defamation claim under D.C. law, which

arose out of the same alleged conspiracy. We have jurisdiction to review the district court's dismissal of the case with prejudice because it is a final judgment for purposes of 28 U.S.C. § 1291.

Mirtchev and Krull Corporation argue, however, that this case presents a non-justiciable political question. If they were correct, both we and the district court would lack jurisdiction to decide this case and we would have to vacate the judgment below. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (when a case involves a political question, "a court lacks the authority to decide the dispute"); *Lin v. United States*, 561 F.3d 502, 505 (D.C. Cir. 2009).

But Mirtchev and Krull Corporation are not correct. At bottom, their argument is that this case "necessarily ask[s] the courts to find that Kazakhstan was involved in racketeering, extortion, and defamation[,]" and that "[c]ondemning foreign government action is a policy determination within the exclusive realm of the executive and legislative branches, which are constitutionally responsible for the nation's foreign relations." Mirtchev Br. 48.

That misunderstands the contours of the political question doctrine. That doctrine bars our jurisdiction only when the Constitution textually commits "the issue" to be adjudicated in the case "to a coordinate political department," or when there is "a lack of judicially discoverable and manageable standards for resolving it." *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 396 U.S. 186, 217 (1962)). As the complaint frames them, the racketeering and extortion issues center on what Mirtchev and Krull Corporation did. Mirtchev and Krull Corporation are both private parties and domestic residents, not foreign governmental entities. Nothing in the Constitution reserves to

the Political Branches the determination of Mirtchev's or Krull Corporation's private civil liability for racketeering or extortion.

In addition, the standards needed to resolve the Houranis' racketeering, extortion, and defamation claims are the workaday tools for decision-making that courts routinely employ. To be sure, a judgment in the case might implicate the actions of a foreign government and the Act of State doctrine, *see infra* 16–24. But that has never been enough, by itself, to trigger the political question doctrine's jurisdictional bar. As the Supreme Court has reminded, even though civil litigation can sometimes affect the Nation's foreign relations, "courts cannot avoid their responsibility merely 'because the issues have political implications.'" *Zivotofsky*, 132 S. Ct. at 1428 (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)).

Indeed, both before and since the enactment of the Foreign Sovereign Immunities Act ("FSIA") in 1976, 28 U.S.C. §§ 1602 *et seq.*, courts have often heard cases directly involving the conduct of foreign governments and foreign officials. *See, e.g.*, *BG Group PLC v. Republic of Argentina*, 134 S. Ct. 1198 (2014); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945); *de Csepel v. Republic of Hungary*, 714 F.3d 591, 594 (D.C. Cir. 2013). And even questions of foreign sovereign immunity are "a matter of grace and comity rather than a constitutional requirement." *Republic of Austria v. Altman*, 541 U.S. 677, 689 (2004). Adjudicating the lawfulness of those acts of a foreign sovereign that are subject to the United States' territorial jurisdiction, in other words, is not an issue that the Constitution entirely forbids the judiciary to entertain, or commits exclusively to the Political Branches.

Secure in our jurisdiction, we turn to the merits.

11

*Standard of Review*

We review *de novo* the district court's dismissal of the complaint for failure to state a claim, *see, e.g.*, *Autor v. Pritzker*, 740 F.3d 176, 179 (D.C. Cir. 2014), asking whether the complaint states "plausible grounds for relief," *Winder v. Erste*, 566 F.3d 209, 213 (D.C. Cir. 2013).

On the cross-appeal, we review the denial of sanctions under Rule 11 for abuse of discretion. *See Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990).

*The RICO and Hobbs Act Claims*

Foreign elements pervade this case. The main actors were Kazakhs, the extorted property was in Kazakhstan, and the key events were committed by Kazakhs to other Kazakhs in Kazakhstan. Fortunately, we need not wade into the thorny question of whether or when RICO applies to such foreign conduct.[2] The Houranis have litigated this case and framed

[2] The courts of appeals have split on the issue. *Compare, e.g.*, *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129, 136 (2d Cir. 2014) (RICO can apply to extraterritorial conduct "if, and only if, liability or guilt could attach to extraterritorial conduct under the relevant RICO predicate."), *with United States v. Chao Fan Xu*, 706 F.3d 965, 974–975, 977 (9th Cir. 2013) ("[W]e begin the present analysis with a presumption that RICO does not apply extraterritorially in a civil or criminal context[,]" and "RICO's focus is on the pattern of racketeering activity for purposes of analyzing extraterritorial application of the statute."), *and Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1351–1352 (11th Cir. 2008) ("RICO may apply extraterritorially if conduct material to the completion of the racketeering occurs in the United States, or if significant effects of the racketeering are felt here.").

their arguments on the assumption that neither RICO nor the Hobbs Act applies extraterritorially, contending that the domestic conduct of Mirtchev and Krull Corporation alone violated RICO and the Hobbs Act. *See* Houranis Br. 11 ("[T]he parties do not dispute that RICO does not apply extraterritorially[.]"); Houranis Reply Br. 19 ("Plaintiffs do not argue that the Hobbs Act has extraterritorial application."). According to the complaint, that domestic conduct consisted of Mirtchev:

- Agreeing, from his Washington, D.C. office, to a scheme in which Kazakh actors expropriated the Houranis' Kazakh assets in Kazakhstan. Amended Complaint ¶ 33.
- Receiving payments from Nazarbayeva in Washington, D.C. bank accounts in the Krull Corporation's name "[a]s compensation for his role in the extortion[.]" *Id.* ¶ 29.
- Laundering money from the expropriation of the Houranis' Kazakh assets through "bank accounts he controls." *Id.* ¶ 40.[3]

---

[3] The complaint also alleges defamation and conspiracy to defame under D.C. law, but those are not predicate acts of racketeering under RICO. *See* 18 U.S.C. § 1961(1)(A). The complaint further asserts that Mirtchev conspired to violate D.C.'s anti-extortion law, D.C. Code § 22-3251, *see* Amended Complaint ¶ 50, violation of which would count as a predicate act of racketeering under RICO, *see* 18 U.S.C. § 1961(1)(A). Unlike the Hobbs Act, the Houranis have not expressly stipulated that the D.C. extortion law does not apply extraterritorially. But the Houranis make only glancing references in two footnotes to, and no substantive arguments about, D.C. extortion law. *See* Houranis Br. 4 n.2, 16 n.5. Any reliance on D.C. extortion law in lieu of the Hobbs Act is thus forfeited. *See, e.g., National Oilseed Processors Ass'n v. OSHA,* 769 F.3d

Those allegations fall short of stating a RICO claim. Starting from the top: The Houranis do not contend that their complaint states a claim of domestic Hobbs Act extortion by Mirtchev or anyone else. Nor do they assert that the actual extortion of their assets in Kazakhstan was itself in any way a violation of the Hobbs Act. They argue only that Mirtchev's agreement in D.C. to Dariga Nazarbayeva's extraterritorial, non-Hobbs-Act extortion scheme in Kazakhstan constituted a conspiracy in the United States to violate the Hobbs Act.

The plain text of the Hobbs Act shutters that argument. That statute, recall, applies to anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion" or who "conspires *so to do*." 18 U.S.C. § 1951(a) (emphasis added). The problem for the Houranis is that, having agreed that the underlying extortion of assets in Kazakhstan did not violate the Hobbs Act, neither could Mirtchev's conspiracy "so to do." *Id.* § 1951(a). That is, the only conspiracies that the Hobbs Act captures are conspiracies to violate the Hobbs Act itself. The conspiracy provision would apply to extortion on foreign soil only if the substantive provisions of the Hobbs Act were to apply to that extortion, which is an argument that the Houranis have declined to press.

Next up, the Houranis allege Mirtchev's and Krull Corporation's involvement in money payments and money laundering. Those allegations fare no better than the conspiracy claim, for two reasons.

---

1173, 1184 (D.C. Cir. 2014) ("[T]he court generally declines to consider an argument if a party buries it in a footnote and raises it in only a conclusory fashion[.]").

*First*, the Houranis have failed to state a claim for money laundering. The federal money laundering statute, 18 U.S.C. § 1956, contains several different prohibitions, but common to all of them is a requirement that the money being laundered must in some way be associated with "unlawful activity." *See, e.g.*, *id.* § 1956(a)(1) (requiring that a covered transaction "involves the proceeds of specified unlawful activity"); *id.* § 1956(a)(2)(A) (prohibiting transferring funds in or through the United States "with the intent to promote the carrying on of specified unlawful activity").

Unfortunately for the Houranis, the statute defines "unlawful activity," and the alleged extortion in Kazakhstan falls outside that definition. In particular, the money laundering statute defines most of the "offense[s] listed in section 1961(1) of this title," 18 U.S.C. § 1961(1), as "unlawful activity." *Id.* § 1956(c)(7)(A). That includes Hobbs Act violations. But the Houranis have said that the extortion itself did not violate the Hobbs Act, and they have not alleged any other prerequisite "unlawful activity" for purposes of the statute.

*Second*, the Houranis' complaint nowhere alleges that they were injured in any way by the alleged acts of money laundering. *See* Houranis Br. 30–31. That is fatal. A civil RICO plaintiff "only has [statutory] standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation," and the "compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern." *Sedima, S.P.R.L. v. Imrex Co, Inc.*, 473 U.S. 479, 496, 497 (1985).[4]

---

[4] The alleged money-laundering activities likely also fail because they do not plausibly allege anything more than "the transparent

With no injury from the money laundering, and no cognizable Hobbs Act claim to supply the missing injury either, the Houranis have no injurious predicate acts at all, let alone a pattern of them. The wheels have completely come off of the Houranis' civil RICO claim.[5]

### *Defamation*

The Houranis allege that Mirtchev "published or caused * * * to be published" a series of defamatory statements against them, including allegations, as paraphrased in the complaint, that they (i) were members and supporters of the terrorist group Hamas, (ii) imported workers into Kazakhstan who were "trained in Islamic terrorist camps," (iii) committed assault, and (iv) owned an apartment in which a woman was falsely imprisoned and later murdered. Amended Complaint ¶¶ 58, 59. Those statements allegedly appeared on the website of the Kazakh Embassy in the United States "with the active support of the Kazakh ambassador," in internal Kazakh government memoranda, in a document known as the "Aliyev Dossier" produced by the "Eurasian Transition Group," in an editorial on Forbes.com, and in "various other Internet publications." *Id.* ¶ 59. Apart from alleging that the Embassy statements were published "on December 18, 2008," and that

---

division or deposit" of "unlawfully obtained funds" from a one-time criminal incident. *See United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2008). We need not definitively resolve that issue, however, given the alternative grounds for affirmance.

[5] The parties devote a great deal of energy to arguing whether a court should look to the location of the enterprise or the location of the pattern of racketeering to decide whether the complaint states a claim for a domestic RICO violation. That dispute is irrelevant in light of the complaint's failure to properly plead a pattern of racketeering that injured the Houranis under either test.

the other statements were published some time "in 2008," the complaint does not provide any further detail on when or where the statements appeared or their actual content. Amended Complaint ¶¶ 58, 62.

The Houranis' defamation claims arising from the alleged publication of materials on the Kazakh Embassy's website "with the active support of the Kazakh ambassador" and in internal Kazakh government documents run afoul of the Act of State doctrine. That doctrine prevents federal courts from "declar[ing] invalid * * * the official act of a foreign sovereign," *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, 405 (1990), involving activities undertaken "within its own territory," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964). *See also Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2084 (2015) ("The actions of a recognized sovereign committed within its own territory also receive deference in domestic courts under the act of state doctrine.").

The "text of the Constitution does not require the act of state doctrine." *Banco Nacional*, 376 U.S. at 423. Instead, the doctrine "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals * * * in the international sphere." *Id*. As such, it operates as a rule of judicial restraint in decisionmaking, not a jurisdictional limitation like the political question doctrine. *See supra* 10; *see also World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 (D.C. Cir. 2002); *In re Papandreou*, 139 F.3d 247, 256 (D.C. Cir. 1998) (The Act of State doctrine "is a substantive

rule of law" that applies only after jurisdiction is established.).[6]

The unusual content of the Houranis' allegations, which we must take as pled, *see de Csepel*, 714 F.3d at 598, 604, triggers the Act of State doctrine in this case. While the Houranis argue that they only seek to hold Mirtchev and Krull Corporation liable for conspiracy to defame, the amended complaint demands a deeper inquiry than that. Defamation requires both defamatory statements and publication of that defamation. *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005). The complaint alleges that Mirtchev "caused" the Embassy of Kazakhstan, with the active involvement of the Ambassador, to be the publisher of the defamatory statements. Amended Complaint ¶ 58. Specifically, the amended complaint maintains that, at Nazarbayeva's behest, (i) the "Kazakh Embassy in Washington, D.C. * * * ma[d]e its website available for anti-Hourani content," Amended Complaint ¶ 57, and the (ii) defamatory statements were then published "with the "active support of the * * * ambassador," in conspiracy with Mirtchev, *id*. ¶ 58.

Accordingly, the defamation alleged here is not Mirtchev's or Krull Corporation's own speech. Nor does the complaint allege that the Ambassador or Embassy unwittingly

---

[6] Because the Act of State doctrine is a rule of judicial restraint, courts may raise the doctrine *sua sponte*. *See Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1533 n.143 (D.C. Cir. 1984), *certiorari granted, judgment vacated on other grounds by Weinberger v. Ramirez de Arellano*, 471 U.S. 1113 (1985). In this case, the parties themselves raised the Act of State doctrine, but their original briefs focused their analysis on the RICO and Hobbs Act claims. Supplemental briefs ordered by the court addressed the doctrine's application to the Houranis' claim of a conspiracy to defame.

published the falsehoods. Quite the opposite, the complaint alleges defamation through the "active" and at least knowing (if not deliberate) publication by Embassy officials at the highest level primed to propagate "anti-Hourani" defamatory messages in the form of official Kazakh government speech on that government's own official platform. The Houranis thus have alleged that the Ambassador was in the thick of the defamation conspiracy against them, and that the critical step of publishing the allegedly false statements—a step that transformed them into defamation—was perpetrated by the official speech of the Kazakh government on an official government platform.

The Houranis contend that the Act of State doctrine does not apply because the Ambassador's conduct took place at the Embassy in Washington, D.C., and not within Kazakh territory. It is certainly true that, as a general rule, the Act of State doctrine applies to foreign government activities undertaken "within its own territory," *Banco Nacional*, 376 U.S. at 401, although that factor is not so inflexible as to overlook the quintessentially sovereign nature of foreign governmental action, *see Yahoo! Inc. v. La Ligue Contre le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1226 (9th Cir. 2006) (Act of State doctrine can apply to actions extending beyond a state's borders if "governmental" in nature); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1121 n.29 (5th Cir. 1985) ("Even when an act of a foreign state affects property outside its territory, however, we may still give effect to the act if doing so is consistent with United States public policy. * * * A foreign state's interest in the enforcement of its laws does not always end at its borders.").[7]

---

[7] The fact that a foreign state's embassy is generally considered to be within the jurisdiction of the host state is, alone, insufficient to find the Act of State doctrine inapplicable to conduct occurring

In any event, the alleged conduct here is rooted, in all relevant respects, within foreign sovereign territory because the defamatory publication was necessarily official governmental speech formulated and directed from Astana, Kazakhstan.  What the Houranis' argument overlooks is that the Ambassador is not just any government functionary, but instead is an official whose defining purpose is to speak for the Kazakh government sitting within its own territory.   The role of the ambassador is to "[r]epresent the sending State [*i.e.*, Kazakhstan] in the receiving State [*i.e.*, the United States]."  Vienna Convention on Diplomatic Relations, Art. 3(1)(a), Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502 (entered into force in U.S. Dec. 13, 1972).   As the "representative[] of a particular sovereign," the Ambassador "serve[s] in the place of the one sending" him.  *Fatemi v. United States*, 192 A.2d 525, 527 (D.C. 1963); *see also Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1295–1297 (11th Cir. 1999).

---

there.  *But cf. El-Hadad v. Embassy of United Arab Emirates*, 69 F. Supp. 2d 69, 81 (D.D.C. 1999), rev'd in part on other grounds, 216 F.3d 29 (D.C. Cir. 2000) (declining to apply Act of State doctrine to foreign government's commercial activities because defendant was an embassy).  To be sure, the law does not treat embassies as the territory of their sovereign for all purposes.  *See, e.g.*, *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 837 (D.C. Cir. 1984) (United States Embassy in Iran not treated as part of the "United States" for purposes of FSIA provision allowing suit against foreign states for tortious injury within the United States).  But it does for some purposes.  *See, e.g.*, Vienna Convention on Diplomatic Relations Art. 22(1), April 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502 (entered into force in U.S. Dec. 13, 1972) ("The premises of the mission shall be inviolable.").  Given both the Act of State doctrine's concern with diplomatic comity, the crucial role of ambassadorial communications in the conduct of diplomacy, and the distinctly non-commercial character of the conduct at issue, the Act of State doctrine appropriately applies in this narrow context.

That is why courts "traditionally have assumed that an ambassador's powers include the authority to present his or her country's position." *Aquamar*, 179 F.3d at 1296. Accordingly, when an ambassador speaks in his or her official capacity, that statement "must be regarded * * * as an authoritative representation by the [foreign] government" itself and, "as such [is] binding and conclusive in the courts of the United States against that government." *Agency of Canadian Car & Foundry Co. v. American Can Co.*, 258 F. 363, 368–369 (2d Cir. 1919). In other words, when an Ambassador speaks through official Embassy channels, like the Embassy website, he or she "speaks as the sovereign authority for the territory" the sending government controls, *Banco Nacional*, 376 U.S. at 410, and gives voice to the foreign government speaking from within its own territory. That is particularly true when, as here, the Ambassador's speech formally communicated the foreign government's official view of domestic events occurring within its own territory, involving its own nationals, and implicating its own national security. When it comes to that type of sovereign speech, courts of the United States must treat the Ambassador's statements "as an authoritative representation by the [Kazakh] government" itself. *Agency of Canadian Car*, 258 F. at 368–369.

For that reason, the Embassy's statements on domestic matters, foreign relations, terrorism, national security, and similar subjects of traditional sovereign and diplomatic communication—the very communications the amended complaint puts into issue here—must be treated as the voice of the Kazakhstan government itself articulating its views as officially formulated and dictated from within its own territory. Whatever Mirtchev's role in their provenance, once the statements appeared on the official Embassy website with the active approval and support of the Ambassador, they

became the official speech of the Kazakh government sitting in Astana, Kazakhstan. And that decision by a foreign government to engage in official speech about its own nationals' domestic activities is the kind of "distinctly sovereign" act and "formal governmental action" concerning internal affairs that triggers the Act of State doctrine's and international comity's traditional concerns. *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073-1074 (D.C. Cir. 2012); *see also Riggs Nat'l Corp. v. Commissioner of Internal Revenue Service*, 163 F.3d 1363, 1366–1368 (D.C. Cir. 1999) (applying Act of State doctrine to an order by a foreign finance minister).[8]

The Houranis' complaint, moreover, makes that foreign-sovereign speech an essential predicate for liability. As the Houranis have pled their case, a court could not find that Mirtchev orchestrated defamation through the Ambassador's "active" publication of "anti-Hourani" defamatory statements on the official Embassy website without necessarily finding that the Kazakhstan government's speech on internal and quintessentially governmental matters was itself defamatory.

---

[8] Importantly, this case does not involve the commercial activities of Embassy staff. *Cf. Alfred Dunhill*, 425 U.S. at 697–698 (Act of State doctrine does not apply to "the purely commercial conduct of foreign governments"); *id.* at 706 (Act of State doctrine not extended to "acts committed by foreign sovereigns in the course of their purely commercial operations") (cited in *McKesson*, 672 F.3d at 1074). This case involves concerns of domestic political affairs, criminality, and national security that are at the core of territorial sovereign prerogatives. *See* Amended Complaint ¶¶ 12, 16 (Nazarbayeva "was contemplating a political career as a possible successor to her father," and the alleged defamation was intended to "neutralize the Houranis' ability to attack [Nazarbayeva] or her father in response to the extortion of their businesses.").

Indeed, the content of the Ambassador's official statements would themselves have to be adjudicated "defamatory" for there to have been any compensable injury inflicted on the Houranis by Mirtchev's conspiracy with the Ambassador and Embassy. There simply is no basis for finding that the statements were defamatory for purposes of Mirtchev's and Krull Corporation's liability without also finding that they were defamatory when coming out of the Kazakhstan government's mouth.

This case is very different from *Kirkpatrick,* in which the court could set aside the validity of a foreign sovereign's actions and focus exclusively on the allegations against private parties. In *Kirkpatrick*, the Supreme Court found no Act of State barrier to allegations that a contract with the Nigerian government was secured through bribery, even though entertaining those allegations would have "impugn[ed] or question[ed] the nobility of a foreign nation's motivations." 493 U.S. at 408 (internal quotation marks omitted). There, deciding the case would not have required the court to declare the government contract legally invalid, *id.* at 406, since liability could attach regardless of the validity of the contract that the bribery secured or even whether government officials had accepted the proffered bribe. The Act of State doctrine accordingly did not apply because the case could be decided without directly adjudicating the lawfulness of the Nigerian government's conduct.

Not so here. The Houranis can recover for the Ambassador's statements on the Embassy website only if they can persuade a factfinder that those official foreign government statements published on a foreign sovereign's own communication platform were themselves *defamatory*, and thus invalid. *See Kirkpatrick*, 493 U.S. at 405 (treating a sovereign action as "tortious would have required denying [it]

legal effect"); *Underhill v. Hernandez*, 168 U.S. 250, 254 (1897) (Act of State doctrine precluded deciding the tortiousness of the "acts of a military commander representing the authority of the revolutionary party as a government"). Whether or not the Ambassador published those statements at Mirtchev's behest, that claim goes beyond impugning the integrity of a foreign sovereign's motives. Such a claim "[]or any asserted defense," *Kirkpatrick*, 493 U.S. at 406, could not be adjudicated without a court having to inquire into the legal validity or tortiousness of the Kazakh government's activities and official government communications.

That the Houranis do not directly sue the Kazakh government or seek damages from it is beside the point. The Act of State doctrine turns on what must be adjudicated, and having intertwined the Ambassador, the Embassy, and Mirtchev in "active" collaboration and joint publication of the defamation, the Houranis' complaint requires that the defamatory content—the "legality"—of that published and official foreign government speech be adjudicated. *See Callejo*, 764 F.2d at 1113 ("[E]ven if the defendant is a private party, not an instrumentality of a foreign state, * * * we nevertheless decline to decide the merits of the case if in doing so we would need to judge the validity of the public acts of a sovereign state performed within its own territory."); *see also Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 697 (1976) (Act of State doctrine "foreclos[es] court adjudications involving the legality of acts of foreign states on their own soil."); *Abourezk v. Reagan*, 785 F.2d 1043, 1071 n.4 (D.C. Cir. 1986) (Bork. J., dissenting) ("A United States court ought not lightly undertake a role in which it must issue a public pronouncement that * * * a foreign government is untruthful about an issue of intergovernmental relations. Few exercises could be further outside the bounds

of judicial competence, or more intrusive with respect to the conduct of foreign affairs.").

Finally, it bears noting that the Houranis' claim arises under District of Columbia law. Congress did not pass the statute at issue, nor did the President sign it into law. The Political Branches thus have not made the sensitive decision to apply defamation law to foreign sovereigns' official communications about events internal to their own territory. *Cf. American Insurance Ass'n v. Garamendi*, 539 U.S. 396, 425–426 (2003) (noting the relative "weakness" of local government's interest in policing official foreign government disclosures). Quite the contrary, the Political Branches have expressly determined that foreign sovereigns should enjoy immunity for claims of "libel, slander, [and] misrepresentation" involving non-commercial matters. 28 U.S.C. § 1605(a)(5)(A). The function of the Act of State doctrine is to promote "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations." *Kirkpatrick*, 493 U.S. at 408. Those same considerations strongly reinforce the appropriateness of our decision not to tread in an area where the Political Branches have waved the courts off.

Similar principles apply to the complaint's allegations about "internal Kazakh Government memoranda[.]" Amended Complaint ¶ 59. But that is just the beginning of those allegations' problems. Absent from the complaint is any plausible allegation of harm from those purported internal governmental exchanges. The only harm that the Houranis claim they suffered as a result of the alleged defamation is that they were "discredit[ed] * * * in the eyes of Western authorities and media." Amended Complaint ¶ 60. There is no plausible suggestion that internal Kazakh Government

memoranda would have been seen by, let alone communicated a defamatory message to, "Western authorities and media." If they had, they would no longer be "internal" memoranda.

As to the remaining allegedly defamatory statements, the amended complaint fails to state a claim under District of Columbia law. To state a claim, a plaintiff must allege that: (1) "the defendant made a false and defamatory statement concerning the plaintiff"; (2) "the defendant published the statement without privilege to a third party"; (3) "the defendant's fault in publishing the statement amounted to at least negligence"; and (4) either "the statement was actionable as a matter of law irrespective of special harm," or "its publication caused the plaintiff special harm." *Oparaugo*, 884 A.2d at 76 (internal quotation marks omitted).

The allegations here stumble at the starting gate. The complaint claims that Mirtchev "published or caused these statements to be published," but it alleges no factual basis whatsoever for that charge. There is no allegation that Mirtchev communicated with Forbes.com; the complaint does not even disclose what was published. There likewise is no explanation of what the "Eurasian Transition Group" is, Mirtchev's relationship to it, or even what the "Aliyev Dossier" is or actually said. Finally, the complaint is devoid of any facts at all about the "various other Internet publications," what they are, what they said, or Mirtchev's involvement with them. Simply alleging that one year someone said something false on the Internet, without more, does not come anywhere near stating a plausible defamation claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (plaintiffs must "nudge[] their claims across the line from conceivable to plausible").

The conspiracy allegation fails for much the same reason. The only agreement identified in the defamation section of the complaint is one between Mirtchev and Dariga Nazarbayeva. *See* Amended Complaint ¶¶ 56, 57. The complaint also alleges that Mirtchev acted "with the active support of the Kazakh ambassador." *Id.* ¶ 58. Those allegations might start to explain Mirtchev's involvement in the Kazakh government's own internal and embassy publications, but those statements do nothing to explain his role in the other referenced publications. There is no allegation of any agreement between Mirtchev and anyone else leading to the publications by Forbes, the "Eurasian Transition Group," or any of the "various other Internet publications." The complaint thus fails to state a claim for defamation or for conspiracy to defame.[9]

### Rule 11 Sanctions

Mirtchev and Krull Corporation cross-appeal the district court's denial of their motion for Rule 11 sanctions. They

---

[9] The complaint also runs into serious difficulties with the District's statute of limitations. The Houranis initially filed the complaint in September 2010, almost two years after the publication of the allegedly defamatory statements. The statute of limitations for defamation claims in the District is one year after publication. *See* D.C. Code § 12-301(4); *Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296, 299 (D.C. 2001). Moreover, the complaint alleges that Forbes and "various other Internet publications" published the defamatory statements in 2008, Amended Complaint ¶¶ 59, 62, so whatever the merits of the Houranis' claim that they were unaware of *Mirtchev*'s involvement until 2010, it is clear that there were other known potential defendants amenable to suit in 2008. Nevertheless, because the complaint fails to state a claim, we need not decide in this case whether the discovery rule or some other doctrine would rescue the defamation claims from the ordinary operation of the statute of limitations.

claim that the plaintiffs relied on forged documents in district court, including the Daulbaev letter.  They also urge sanctions because the two versions of the complaint are contradictory over who took the Houranis' assets:  the Kazakh government (in the original complaint), or Dariga Nazarbayeva (in the amended complaint).

The district court acknowledged that the different versions of the complaint were mutually contradictory, and found the plaintiffs' explanations for the inconsistencies "difficult to accept."  *Hourani*, 943 F. Supp. 2d at 171–172.  The court made no finding on the forgery issue, however.  *Id.* at 161–162 n.4.

Rule 11 requires a party to certify, among other things, that "the factual contentions [in a pleading] have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]"  Fed. R. Civ. P. 11(b)(3).  Since the Rule was amended in 1983, courts must apply an objective standard of reasonableness in determining whether there has been a violation of the Rule; a finding of bad faith is not required.  *See Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 554 (1991).

But once a district court finds a Rule 11 violation, it retains broad discretion in imposing sanctions.  A sanction imposed under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  Fed. R. Civ. P. 11(c)(4).  Proper considerations in exercising that discretion specifically include "[w]hether the improper conduct was willful, or negligent," and "whether it was intended to injure."  Fed. R. Civ. P. 11, Advisory Committee Note to 1993 amendment.

Here, the district court cited the correct objective standard for determining the existence of a Rule 11 violation at the outset. *See Hourani*, 943 F. Supp. 2d at 170. After examining the allegations of contradictory pleadings, the court stated that it chose "not to impute bad faith on the part of the [p]laintiffs, finding ample grounds for dismissing the complaint on the substantive grounds" identified in its decision. *Id.* at 172.

Mirtchev and Krull Corporation claim that the court abused its discretion by applying a pre-1983 subjective test when it declined to impute bad faith on the part of the plaintiffs. We disagree. The court below did not find that there was any violation of Rule 11; it made no finding either way so thus had no occasion to apply the Rule's objective test. Instead, the court skipped that step and determined that, even if there had been a violation, it would not exercise its discretion to dismiss the complaint because of both the lack of bad faith and the complaint already being dismissed on the merits. The district court acted well within its discretion in deciding that devoting further resources to investigating the alleged forgeries was not worth the candle since the case was already terminated.

## IV

### Conclusion

For those reasons, we affirm the judgment dismissing the case and declining to impose sanctions under Rule 11.

*So ordered.*